[Cite as *State v. Orr*, 2014-Ohio-4680.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 100841

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARLLEL B. ORR

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-560637-A

**BEFORE:** Boyle, A.J., Celebrezze, J., and McCormack, J.

**RELEASED AND JOURNALIZED:** October 23, 2014

**ATTORNEY FOR APPELLANT**

Edwin J. Vargas
Summers & Vargas Co., L.P.A.
The Gehring Building
1956 West 25th Street, Suite 3
Cleveland, Ohio   44113

Darllel B. Orr, pro se
Inmate No. 0206100
Cuyahoga County Jail
P.O. Box 5600
Cleveland, Ohio   44101

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Brent C. Kirvel
          Edward R. Fadel
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, A.J.:

{¶1} Defendant-appellant, Darllel Orr, appeals his convictions for aggravated murder, kidnapping, aggravated burglary, aggravated robbery, and having a weapon while under a disability. Through counsel, Orr raises four assignments of error for our review. Pro se, Orr raises ten supplemental assignments of error.[1]

Orr's Assignments of Error

1. The trial court was without jurisdiction to conduct a bench trial because the jury waiver was a conditional waiver and the requirements of R.C. 2945.05 were not strictly followed.

2. The trial court abused its discretion and violated the appellant's Sixth and Fourteenth Amendment rights to a complete defense and compulsory process.

3. The trial court erred in convicting the defendant for aggravated murder, kidnapping, aggravated burglary, aggravated robbery, and weapon while under disability where the appellant's conviction is against the manifest weight of the evidence.

4. The evidence was insufficient to sustain a finding of guilty because the state failed to present evidence to establish beyond a reasonable doubt the elements necessary to support the conviction.

Orr's Pro Se Supplemental Assignments of Error

1. Trial court lacked subject matter jurisdiction pursuant to the record being devoid of a valid complaint.
2. Trial court was without authority/jurisdiction to proceed to a bench trial, absent valid waiver in strict compliance with [R.C.] 2945.05.

---

[1]Orr filed his first seven pro se supplemental assignments of error after this court granted his motion to do so. Orr later moved to file additional pro se supplemental assignments of error (his eighth, ninth, and tenth assignments of error), which this court denied. Nonetheless, in the interest of justice, we will address all of Orr's pro se supplemental assignments of error.

3. Mr. Orr was denied his 6th U.S.C.A. right to so confront his accuser(s) insofar as an unsworn, untested testimonial hearsay/statement provided by Det. Entenok goes.

4. The convictions sustained by Mr. Orr are not underpinned by sufficient evidence, as required by the 5th U.S.C.A.

5. Mr. Orr was denied his statutory and constitutional right to a speedy and public trial.

6. Mr. Orr was denied his constitutional right to a speedy disposition.

7. Trial court abused its discretion by refusing to recuse in accord to law and capriciously engaged in misleading Mr. Orr to waive right to trial by jury involuntarily and through fraud.

8. The trial court erred in failing to grant the appellant's motion for acquittal pursuant to [Crim.R. 29] as the evidence presented by the state at trial was insufficient to prove the elements of the offenses.

9. The state's closing arguments contained statements that went beyond the record and were not substantiated by the evidence and therefore violated appellant's right to due process.

10. The verdict was against the manifest weight of the evidence.

Procedural History and Facts

{¶2} In March 2012, the Cuyahoga County Grand Jury indicted Orr on six counts: two counts of aggravated murder in violation of R.C. 2903.01(A) and (B); kidnapping in violation of R.C. 2905.01(A)(2); aggravated burglary in violation of R.C. 2911.11(A)(1); aggravated robbery in violation of R.C. 2911.01(A)(3); and having a weapon while under disability in violation of R.C. 2923.13(A)(2). The aggravated murder counts and the weapon while under disability count contained one- and three-year firearm specifications, and the remaining counts contained the same firearm

specifications, as well as notice of prior conviction and repeat violent offender specifications. The following facts were presented to the bench (the facts regarding Orr's arguments about the jury waiver will be discussed within the analysis).

{¶3} Yaisa Jones testified that in October 2011, she lived on West 97th Street, in Cleveland, Ohio, with the victim, Peter Nelson, Jr., and her four children — S.J. (who was 15 years old at that time), D.J. (who was 13 years old at that time), I.J. (who was 9 years old at that time), and P.J. (who was 4 years old at that time). Jones stated that Nelson was her fiancé and the father of one of her daughters.

{¶4} Jones testified that on October 10, 2011, she had gotten up at 4:45 a.m. to go to work at her normal time. She left her house around 5:30 a.m. that morning. Jones was a rehabilitation specialist; she assisted elderly people with developmental disabilities. Before she left, she saw her daughter, S.J., go to the bathroom, but she did not speak to her because S.J. went back to bed. Jones said that Nelson was up and in the kitchen before she left. Soon after she got to work, she received a call from a police officer that there had been an incident at her house. She drove home and learned that her fiancé had been killed.

{¶5} Jones stated that she drove a silver Lincoln Navigator. Nelson drove a gray Porsche Cayenne and also had an older red Oldsmobile. Jones said that she returned to her home to get her belongings, but never lived in the house after Nelson was killed. Jones was aware that Nelson smoked and sold marijuana.

**{¶6}** Jones testified that she was not aware that an anonymous call was made to 911 about 12 hours after the homicide, reporting that a gray Lincoln Navigator with license plate number FOQ7857 was at the house, and that two people were carrying bags of items out of the window of the house. Jones did not know her license plate number. She also denied that she went back to the house while it was still a crime scene, but stated that it was possible that she let someone drive her Navigator that day; she could not recall. Jones was at Nelson's aunt's house around that time. She said that it was possible that her children wanted some of their belongings out of the house.

**{¶7}** Jones agreed on cross-examination that she was aware that her daughter, Deshawnte Jackson (who was an adult and not living with Jones and Nelson) told her that her friend "Mike-Mike" told her that "Marcel" said that he was going to rob Nelson.

**{¶8}** S.J. testified that on October 10, 2011, she got up and went to the bathroom before her mom went to work, but she did not talk to her mom. She went back to bed; it was still dark. She heard a "big boom" that woke her up, but she thought she was dreaming so she laid back down. S.J. stated that a couple of minutes later, she heard someone come in her room. She turned over, and there were two men standing over her with handguns pointed at her face. S.J. said that because it was dark, she could not see very well. She testified that one of the men was wearing dark clothes and the other was wearing lighter-colored clothes.

**{¶9}** S.J. testified that one of the men left her room, while the other remained. The man sat on her bed. S.J. said that she sat up, but did not look at the man; she kept

her head down. The man asked her if her mother was still there. The man also asked her who else was in the house. S.J. said that her dog, who was in a crate in the kitchen, began barking. The man asked her why she did not tell him that she had a dog. The man then asked her if there was any money in the house. S.J. said that her siblings came into her bedroom at that point; she had her own room, but her siblings all shared the other upstairs bedroom.

{¶10} S.J. heard the other man yell from downstairs for the man in her room. The man in her room then walked out of her bedroom. S.J. heard a gunshot and saw a "flash of light." S.J. called 911 at that point. S.J. said that the men's faces were not covered, but they were both wearing hoods.

{¶11} D.J. testified that she heard the two men come into her bedroom, which was a large room at the top of the stairs without a door. She saw them go in S.J.'s bedroom. D.J. said that she saw one of the men come out of S.J.'s bedroom a minute later and go downstairs. She heard that man arguing with Nelson; she heard them "tussling" and fighting, and she heard Nelson yelling "stop" and "no." She woke up her other sibling, who shared a room with her, and they went to S.J.'s bedroom. D.J. said that she forgot that the other man was still in S.J.'s bedroom. She told S.J., "I think we are getting robbed." The man said, "yea, sit down." She then heard the man from downstairs scream "help." The man in S.J.'s bedroom got up and said, "don't scream because you probably about to hear a lot of shooting."

{¶12} When police arrived at the scene, the front door was locked but the back door, into the kitchen, was wide open. There was no sign of a forced entry. Police officers testified that the kitchen and dining room showed signs of a struggle. Police found Nelson lying at the top of the stairs. He had been shot in the head. Police found the children in one of the bedrooms. Firefighters helped get the children out of the house through an upstairs bedroom window so that they did not have to see Nelson.

{¶13} Officers who arrived soon after the first responders secured the scene and collected many items for testing, including fingerprints, three cell phones (an LG phone found on the kitchen floor and two other brands in a bedroom), suspected crack cocaine, a digital scale, a brown glove, a black half-face mask (found behind the kitchen door), a gun under the bed, bullet "magazines," and spent shell casings. Police also found almost $1,700 in the home.

{¶14} Police officers determined that two of the cell phones found at the scene belonged to Nelson, but one of the cell phones, the LG phone, did not belong to anyone in the home. Police officers obtained a search warrant and discovered that the service provider for the LG phone was Revol Wireless. Through Revol Wireless, police officers learned that the phone was registered to Brenda Howell, Orr's mother.

{¶15} Police officers spoke to Howell in late October 2011. The officers discovered that Howell had permitted Orr to use the LG cell phone when he got out of prison earlier that month. Howell explained that the phone belonged to her daughter, but she allowed Orr to use it when he got out of prison because her daughter was incarcerated

at that time. Howell testified that she allowed others to use the phone as well. Howell further testified that her son told her that he lost the phone before police talked to her, but she did not cancel the cell service on the lost phone. She could not explain why she did not cancel the cell service.

{¶16} Police officers first talked to Orr in early December 2011; Orr stated that he lost the cell phone, but he could not remember where he lost it. He denied knowing why it was found at the scene of a homicide. Orr agreed to give police a cheek swab.

{¶17} Police detectives determined that there were three contacts saved in the LG cell phone — "Toon," "Ox," and "Van." Police discovered that Orr was incarcerated with "Ox," whose name was Dajuan Fields. Orr, however, denied knowing "Ox" or "Toon." A custodian of records from Revol Wireless testified that two calls were made from the LG cell phone to Dajuan Fields on the morning of October 10, 2011, at 4:16 a.m. and 4:46 a.m. Further, one call was made from the LG cell phone to the phone that Orr's mother, Howell, personally used. Howell's number was not a saved contact in the LG cell phone.

{¶18} Ballistic experts determined that the bullets found at the scene did not match the gun that was found at the scene.

{¶19} Police officers showed the children photo arrays. The children were not able to identify anyone in the photo arrays.

{¶20} Carey Baucher, a forensic scientist specializing in DNA testing for the Cuyahoga County medical examiner's office, testified that she analyzed a portion near the

mouth of the black half-face mask found at the scene; the DNA on the mask matched Orr's DNA. Baucher explained that the results showed that the DNA was a "single source full profile." Orr's DNA was not found on any other piece of evidence collected at the scene.

{¶21} The state also established that Orr was convicted of aggravated robbery in 2003.

{¶22} Orr moved for a Crim.R. 29 acquittal, which was denied by the trial court. After the state rested, Orr presented 20 witnesses on his behalf, including himself, members of the victim's family, members of his own family, police officers and detectives, his parole officer, his investigator in the case, and a private DNA analyst from DNA Diagnostic Center. Members of Orr's family testified that when he got out of prison, he helped his sister every day by babysitting for his young niece. Orr's mother agreed that she let many other people use the cell phone, not just Orr. Orr denied any involvement in the crime.

{¶23} Stacy Martin, a DNA analyst from the DNA Diagnostic Center, testified that she analyzed the black half-face mask that was sent to her by Orr. She concluded that both the mask and a section of the mask that was cut from the mouth of the mask had DNA on them that matched Orr's DNA. She stated that she also observed minor "alleles" on the sample that were below reporting standards, so she could not make any conclusions regarding the minor "alleles."

{¶24} At the close of all of the evidence, the trial court found Orr guilty of all charges and specifications.[2] Before sentencing Orr, the trial court merged the two aggravated murder counts, aggravated robbery and aggravated burglary, as well as the one- and three-year firearm specifications attached to each count. The state elected to proceed on the aggravated murder under R.C. 2903.01(B).

{¶25} The trial court sentenced Orr to life in prison without parole for aggravated murder under R.C. 2903.01(B), and imposed three years for the firearm specifications, to be served consecutive to and prior to the base charge of murder. The trial court sentenced Orr to 19 years on the kidnapping count — 11 years for kidnapping, five years for the repeat violent offender specifications, and three years for the firearm specifications to be served consecutive to and prior to the kidnapping count. The trial also court sentenced Orr to 36 months for having a weapon while under disability, and ordered that the sentences for aggravated murder, kidnapping, and having a weapon while under disability be served concurrent to each other. It is from this judgment that Orr appeals. We will address Orr's assignments of error and supplemental assignments of error together and out of order where necessary for ease of discussion and analysis.

Jury Waiver

---

[2]The state dismissed the one- and three-year firearm specifications on the count of having a weapon while under a disability.

{¶26} In Orr's first assignment of error and his second and seventh supplemental assignments of error, he argues that he did not voluntarily waive his right to a jury trial and that the trial court was without jurisdiction to conduct a bench trial because it did not strictly comply with the requirements of R.C. 2945.05.

{¶27} Specifically, Orr maintains that his waiver was conditional and involuntary because the trial judge refused to recuse himself from his case and, thus, Orr maintains that his jury waiver was not valid.

{¶28} A criminal defendant's right to a jury trial is guaranteed in the Sixth and Fourteenth Amendments to the United States Constitution and Sections 5 and 10, Article I, of the Ohio Constitution. *State v. Burnside*, 186 Ohio App.3d 733, 2010-Ohio-1235, 930 N.E.2d 372, ¶ 45 (2d Dist.). Regarding serious offenses, an accused may not be deprived of this right unless it is knowingly, intelligently, and voluntarily waived. *See Duncan v. Louisiana*, 391 U.S. 145, 154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); R.C. 2945.05; Crim.R. 23(A).

{¶29} Crim.R. 23(A) provides:

> In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney. In petty offense cases, where there is a right of jury trial, the defendant shall be tried by the court unless he demands a jury trial. Such demand must be in writing and filed with the clerk of court not less than ten days prior to the date set for trial, or on or before the third day following receipt of notice of the date set for trial, whichever is later. Failure to demand a jury trial as provided in this subdivision is a complete waiver of the right thereto.

{¶30} R.C. 2945.05 provides:

In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I ........, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

{¶31} Under the plain language of Section 2945.05, the entirety of a defendant's jury-trial waiver must be in writing. R.C. 2945.05; *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, _ 9. The Ohio Supreme Court explained that "to be valid, a waiver [under Section 2945.05] must meet five conditions. It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *Id.*

{¶32} The Ohio Supreme has held that, "[a]bsent strict compliance with the requirements of R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury." *State v. Pless*, 74 Ohio St.3d 333, 658 N.E.2d 766 (1996), paragraph one of the syllabus. Although "Ohio courts have declined to find that the language of the waiver must be a verbatim recitation of R.C. 2945.05," the content of the waiver must be in "[s]ubstantial compliance" with the suggested language. *State v. Woodbridge*, 9th Dist. Summit No. 26911, 2014-Ohio-1388, _ 6, citing *State v. Webb*, 10th Dist. Franklin No. 10AP-289, 2010-Ohio-6122, ¶ 26-27.

**{¶33}** In this case, Orr refused to sign the court's jury waiver form. In refusing to do so, Orr told the court that he had written his own jury waiver, which he filed with the clerk of courts. The court explained to Orr that he had a right to a jury trial. The court made sure that Orr understood that right and that he was knowingly, intelligently, and voluntarily waiving that right. Orr then read his written waiver into the record in open court:

> Now comes the defendant, Darllel B. Orr unrepresented, in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a judge of the court other than my judge of record in which the said cause may be pending [if any reasonable alternatives are available under equal protection of the laws.] I fully understand that under the laws of this state, if I am "compelled" to enter this [corporation] of such an overt, unjustifiable, and void for subject matter jurisdiction proceeding without my [Crim.R. 3] complaint and [Crim.R. 4] probable cause determination complying with law, that "I do have a constitutional right to a trial by jury."

**{¶34}** The record reflects that before the court addressed the issue of jury waiver, the court denied several other motions that Orr had previously made (although Orr denied in court that his requests were motions, he was nonetheless requesting the court to act). One such motion was Orr's request for the trial judge to recuse himself from his case, which the court denied. Then, after Orr read his written jury waiver into the record, the court asked him, "Knowing now [that] I will not recuse myself, do you wish to invoke your right to a jury trial?" Orr responded that he did not wish to do so. The court proceeded with the bench trial.

**{¶35}** Ohio courts have characterized the colloquy required between the court and a criminal defendant regarding a jury trial waiver as "extensive enough for the judge to

make a reasonable determination that the defendant has been advised and is aware of the implications of voluntarily relinquishing a constitutional right." *State v. Carothers*, 8th Dist. Cuyahoga No. 82860, 2004-Ohio-51, quoting *State v. Walker*, 90 Ohio App.3d 352, 358, 629 N.E.2d 471 (3d Dist.1993).

{¶36} After review of the record in this case, we conclude that Orr knowingly, intelligently, and voluntarily waived his constitutional right to a jury trial and that the trial court properly accepted his written waiver, even though it was conditioned on having another judge try his case. Orr refused to sign the court's waiver, insisting that the court accept his own waiver. After he read his own waiver in the record, the judge asked him if he wanted to try his case to a jury knowing that the judge was not going to recuse himself. Orr stated no. Orr cannot now argue that his waiver was not voluntary or that the trial court erred by accepting his waiver.

{¶37} Orr's three assignments of error addressing jury waiver are overruled.

Right to Present a Complete Defense

{¶38} In his second assignment of error, Orr argues that his Sixth and Fourteenth Amendment rights to a complete defense and compulsory process were violated. Orr maintains that he wished to call, but was not ultimately able to call, Officer Erb and Kenneth White. Orr claims that the trial court abruptly ended the trial, without ever asking Orr if he was prepared to close, without asking Orr if he had any further witnesses, and took an "unusual tactic" of admitting exhibits out of order. Orr's recitation of what

actually occurred "[n]ear the close of the case," however, could not be further from what actually happened.

{¶39} In *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court recognized that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations." Although *Chambers* referred to due process, the court has since explained that

> [w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."

*Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and citing *Chambers* and *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). As stated in *Crane*, "[t]hat opportunity would be an empty one if the state were permitted to exclude competent, reliable evidence * * * when such evidence is central to the defendant's claim of innocence." *Id.* at 690.

{¶40} Although the right to present a defense is a fundamental element of due process of law, the right is not without limits. *Washington* at 19-21; *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 13. The right has only been applied to "testimony [that] would have been relevant and material, and * * * vital to the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), quoting *Washington* at 16. Moreover, the testimony or evidence

must otherwise be admissible under the rules of evidence. *Taylor v. Illinois*, 484 U.S. 400, 411, 108 S.Ct. 646, 98 L.Ed.2d 798 (1987). Thus, the accused "'must at least make some plausible showing of how [a witness's] testimony would have been both material and favorable to his defense." *Cleveland v. Alexander*, 8th Dist. Cuyahoga No. 92282, 2009-Ohio- 4566, ¶ 27, quoting *Valenzuela-Bernal*. *See also State v. Abdelhaq*, 8th Dist. Cuyahoga No. 74534, 1999 Ohio App. LEXIS 5573 (Nov. 24, 1999).

{¶41} Further, a defendant's interest in presenting evidence in his or her defense must "'bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), quoting *Chambers* at 294, 295. As a result, state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock* at 56. The Supreme Court finds the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. *Washington* at 22-23.

{¶42} In this case, Orr argues that the trial court prevented him from calling Officer Erb and Kenneth White in his defense. Kenneth White was the 911 caller who reported seeing the Lincoln Navigator outside the victim's residence approximately 12 hours after the murder, when the home was secured as a crime scene and, thus, no one

was supposed to enter. Officer Erb, along with Officer Lentz, was one of the first two police officers who arrived to the scene of the crime; Officer Erb wrote the police report.

{¶43} The trial began on Tuesday, July 23, 2013. Orr began presenting his defense on Wednesday, July 31, 2013. Two weeks later, on Wednesday, August 14, after Orr had presented 17 witnesses, the state requested to know who Orr's final witnesses would be because they were nearing the end of the case. The trial court began the lengthy process of asking Orr who else he wished to call (this "process" lasted for three days). Two days, later, on Friday, August 16, 2013, after Orr had put on two more witnesses, the trial court asked Orr if he had any other witnesses. Orr stated that he still wished to call Kenneth White, Officer Erb, and his investigator, Brenda Bickerstaff. But none of these witnesses was present in court to testify. The trial court indicated to Orr that because he did not have any other witnesses, it was "time to rest [his] case." The trial court began asking Orr which of his exhibits he wished to admit into evidence. After the court had gone through all of the exhibits, Bickerstaff appeared in court.

{¶44} According to Bickerstaff and stand-by counsel, Officer Erb had retired from the police force and his whereabouts were unknown. Bickerstaff had found Officer Erb's ex-wife, but not Officer Erb. Further, Bickerstaff explained to the judge that Kenneth White had moved. At first, she had not been able to locate him, but she later located his new address and stated that she left a subpoena at his new residence, but he did not show up for court. On Friday, August 16, 2013, she told the court that she would attempt to locate Kenneth White at his work to personally serve him a subpoena for the

following Monday morning. The trial court made clear on that day, Friday, August 16, that the following Monday would be Orr's last chance to "get witnesses together."

{¶45} That following Monday morning, August 19, 2013, the trial court asked Orr who else he had as a witness. Orr indicated that he wished to call Bickerstaff. Orr further indicated that he still wished to call Officer Erb and Kenneth White. Orr stated that Bickerstaff was supposed to subpoena both witnesses for that day. Stand-by counsel also indicated that they spoke to Bickerstaff on Friday; she still had not been able to locate Officer Erb, but said that she would still try to do so over the weekend. But on that Monday morning, no one was present to testify for Orr, not Bickerstaff, White, or Officer Erb.

{¶46} Without any witnesses present to testify for Orr, the trial court informed Orr that he did not have any more witnesses. Thus, when Orr did not have any other witnesses to present, the trial court asked Orr if he wished to move for a Crim.R. 29 acquittal, which Orr did and the trial court denied.

{¶47} At that point, the state gave its initial closing argument, followed by Orr's closing argument. After Orr completed his closing argument, he informed the court that he wanted to "rescind all exhibits" that he entered. He also told the court that he wanted to make sure that a few of his "objections" were "preserved" for the record. At that point, Bickerstaff arrived at court.

{¶48} Bickerstaff informed the court that she did find retired police officer Mitchell Erb. She explained that he was staying with his in-laws, but that he was not

available. Bickerstaff said that the in-laws called Officer Erb, but he instructed them not to accept the subpoena. Bickerstaff explained to Officer Erb's in-laws that she had to hand the subpoena to Officer Erb personally anyway. Kenneth White was not mentioned.

**{¶49}** The trial court then permitted Orr to put Bickerstaff on the stand. She discussed her investigation. But when Orr and Bickerstaff began disagreeing about what her duties were, the trial court cut Orr off from questioning Bickerstaff about anything that was not relevant to his defense. When Orr continued asking Bickerstaff questions that she could not answer in court, the trial court told Orr to ask "a question that is relevant to this case." Orr continued to argue with the trial court, so the trial court ended the questioning and advised Bickerstaff that she was done testifying.

**{¶50}** The state then gave its rebuttal closing argument. After the state was finished, Orr continued to try to talk to the trial court about a "Declaration Rebutting the Presumption that Probable Cause Exists for the Institution of Prosecution" that he planned to file that morning (he had been trying to discuss it with the trial court all morning). The state said that it had no objection to Orr filing the document. Orr continued to say that he wanted to have it entered as an exhibit. The trial court agreed to mark it as an exhibit, but noted that it had "very little evidentiary value, if any."

**{¶51}** At that point, Orr then told the trial court that he had not completed his closing arguments because Bickerstaff had interrupted them. The court disagreed with Orr that he had not completed his closing arguments, stating that Orr was actually in the

middle of preserving his "objections" when Bickerstaff came into the courtroom. Nonetheless, the trial court permitted Orr to continue his closing arguments (for another 20 pages of the transcript).

{¶52} After review, we find that Orr's right to present a complete defense was not violated by the trial court. The record reflects that the trial court bent over backwards to allow Orr the time he needed to obtain his witnesses and present his defense. Indeed, the trial court only went out of order, accepting Orr's exhibits, and then allowing him to call another witness, to accommodate Orr. This was just one of the many ways the trial court attempted to accommodate Orr throughout the trial.

{¶53} Evid.R. 611(A) grants the trial court discretion to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" so as to "make the interrogation and presentation effective for the ascertainment of the truth [and] avoid needless consumption of time[.]" It was well within the trial court's discretion to reopen Orr's case to permit him to put another witness on in his defense. Trial courts are given great deference in controlling their dockets. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981).

{¶54} Further, Officer Lentz testified that he and Officer Erb were the first officers to arrive on the scene (although Officer Erb wrote the report). Officer Lentz already testified as to what he and Officer Erb observed when they first arrived. Orr cross-examined Officer Lentz extensively, including questioning him about what was in Officer Erb's report. And the 911 call, regarding the Lincoln Navigator being at the

scene 12 hours after the murder, was played in court; indeed, Orr played it in court even before the state had a chance to authenticate it. Thus, the evidence that Orr could have obtained from Officer Erb or Kenneth White would likely be cumulative.

{¶55} Moreover, the trial in this case began on Tuesday, July 23, 2013. Orr began presenting his defense on Wednesday, July 31. He presented a total of 19 witnesses, without any time limits put on him by the trial court. It was certainly well within the trial court's discretion to begin discussing the close of the case with Orr on Wednesday, August 14, 2013, and to advise Orr on Friday, August 16, 2013, that he had until Monday to get his remaining witnesses together. We find that doing so did not infringe "upon a weighty interest of the accused." *See Washington*, 388 U.S. at 22-23, 87 S.Ct. 1920, 18 L.Ed.2d 1019.

{¶56} Accordingly, after reviewing the entire record, we conclude that Orr was not prevented from presenting a complete defense. His second assignment of error is overruled.

### Sufficiency of the Evidence

{¶57} In his fourth assignment of error, Orr contends that the state failed to present sufficient evidence to convict him of aggravated murder under R.C. 2903.01(A) and (B), aggravated burglary, and the firearm specifications under R.C. 2941.141(A) and 2941.145(A). In his fourth and eighth supplemental assignments of error, Orr argues that the state failed to present sufficient evidence for his convictions because it did not sufficiently establish his identity or that "a criminal conspiracy was afoot."

**{¶58}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

A. *Identity and Complicity*

**{¶59}** Because identity and complicity encompass each of Orr's convictions, we will address them first. Orr argues that the state's evidence was not sufficient to establish his identity because no witness testified that the offenders were wearing masks on the morning of the murder. He further maintains that S.J. heard the accomplice, but could not identify his voice. Finally, he argues that no one identified him in a photo array.

**{¶60}** We note at the outset that proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *Jenks*, paragraph one of the syllabus. Indeed, "'direct evidence of fact is not required[;] circumstantial evidence * * * may also be more certain, satisfying and

persuasive than direct evidence.'" *State v. Lott,* 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). Just as any element, "circumstantial evidence may be sufficient to establish the identity of [the] accused as the person who committed the crime." *State v. Scott*, 3 Ohio App.2d 239, 244-245, 210 N.E.2d 289 (7th Dist.1965); *see also State v. Brown*, 10th Dist. Franklin No. 07AP-244, 2007-Ohio-6542, ¶ 19.

**{¶61}** In this case, the state presented evidence that an LG cell phone and black half-face mask was found in the victim's kitchen. The cell phone and mask did not belong to any person who lived in the house. The state learned that the cell phone belonged to Orr's mother, Brenda Howell. Howell told police that she let her son use the cell phone when he got out of prison — six days before the murder.

**{¶62}** On the morning of the murder, at 4:14 a.m., someone using the LG cell phone called Howell's personal cell phone. Howell's cell phone number was not a saved contact in the LG cell phone and, thus, whoever called Howell must have known Howell's number by memory.

**{¶63}** Further, DNA found near the mouth of the black half-face mask matched Orr's DNA. This evidence, coupled with the evidence regarding the cell phone, is sufficient to prove Orr's identity beyond a reasonable doubt.

**{¶64}** Orr also argues that the state failed to prove beyond a reasonable doubt that a "nexus" existed between himself and the other offender, such that it established that "he participated in a larger conspiracy to cause serious physical harm to the victim."

**{¶65}** A charge of complicity may be stated in terms of the complicity statute or in terms of the principal offense. R.C. 2923.03(F). To support a conviction for complicity by aiding and abetting, the state must present evidence to show that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). The defendant's intent may be inferred from the circumstances surrounding the crime. *Id.* The defendant's "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.*, quoting *State v. Pruett*, 28 Ohio App.2d 29, 273 N.E.2d 884 (4th Dist.1971).

**{¶66}** Here, the state presented evidence that two men entered the victim's home sometime between 5:30 a.m. and 6:00 a.m. on the morning of October 10, 2011, went upstairs to S.J.'s bedroom, and woke her up by pointing two handguns at her face. While one man remained in her bedroom, the other man proceeded to go back downstairs and get into a physical altercation with the victim; D.J. heard the fighting and heard the victim saying "no" and "stop." The man who remained in S.J.'s bedroom asked her a series of questions, including was there "any money in the house?"

**{¶67}** Then, when the victim apparently got away from the man he had been fighting with on the first floor of the house, that man yelled "help" upstairs to the other man who was in the bedroom. The man in the bedroom told the children, "don't scream because you probably about to hear a lot of shooting." The man in the bedroom then

walked out of the bedroom and shot the victim, who was at the top of the stairs, in the head.

**{¶68}** After reviewing this evidence, we find that the state presented sufficient evidence that Orr aided and abetted the other offender in the victim's murder.

**{¶69}** Orr's fourth and eighth supplemental assignments of error are overruled.

B.      *Aggravated Murder*

**{¶70}** In his fourth assignment of error, Orr argues that there was no evidence that he acted purposely to support murder under R.C. 2903.01(A) or (B), nor was there any evidence of prior calculation and design to support his conviction under R.C. 2903.01(A).

**{¶71}** Aggravated murder under R.C. 2903.01 provides in relevant part:

(A) No person shall purposely, and with prior calculation and design, cause the death of another[.]

(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

1. *Purposely*

**{¶72}** R.C. 2901.22(A) states that "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

An offender acts purposely when he or she intends the proscribed result. An offender acts knowingly when, although he or she may be indifferent to the result, the actor was nevertheless conscious that the unlawful result would occur. For example, one "purposely" kills another when he discharges a firearm in the direction of the intended victim seeking to bring about his death. However, one would "knowingly" kill another if she simply discharged the same firearm in the direction of the victim, not seeking to effect death (she may well have committed the act for the purpose of testing the weapon) but knowing full well that death would result. In other words, "purpose" depends on an intended result, while "knowledge" is consciousness that the proscribed result will occur.

*State v. Chambers*, 4th Dist. Adams No. 10CA902, 2011-Ohio-4352, ¶ 35, fn. 2, quoting Katz & Gianelli, *Ohio Criminal Law,* Section 85.7 (2010 Ed.).

**{¶73}** The state established that when one accomplice yelled for "help" from downstairs, the other came out of the bedroom, after telling the children not to scream because they were about to hear "a lot of shooting," and immediately shot the victim in the head. This evidence is sufficient to establish that the offender acted "purposely," intending to kill the victim.

## 2. *Prior Calculation and Design*

**{¶74}** "Prior calculation and design" indicates "studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). The Revised Code does not define "prior calculation and design," but the Ohio Supreme Court

ha[s] interpreted the phrase to require evidence of "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). While "'[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in

themselves,'" "momentary deliberation is insufficient." *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01.

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38.

{¶75} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways: (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer the defendant had a preconceived notion to kill regardless of how the robbery unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill. *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53, citing *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.). Furthermore, the execution-style mode indicates conformance with a plan, not simply an "explosive, short-duration situation." *Id.*, citing *Taylor* at 17-18.

{¶76} The scheme must be "designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Prior calculation and design can be found even when a plan to kill is quickly conceived and executed within minutes. *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), citing *State v. Palmer*, 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685 (1997) (road-rage double homicide that quickly occurred after traffic accident); *Taylor* at 20-23 (chance encounter in bar between rivals for another's affections). A momentary impulse, however, is insufficient. *See Conway.*

{¶77} The existence of prior calculation and design is determined on a case-by-case analysis of the facts and evidence. *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). The Ohio Supreme Court has said that it "is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design." *Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82. "Instead, each case turns on the particular facts and evidence presented at trial." *Id.*

{¶78} Although there is no bright-line rule for determining prior calculation and design, the Ohio Supreme Court has found the following factors pertinent to determining the existence of prior calculation and design:

> (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"

*Taylor* at 19, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976). These factors should be weighed with the totality of the circumstances surrounding the murder. *Jenkins* at 102.

{¶79} Although there is no evidence that Orr knew the victim, we find that construing the evidence in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Orr and his accomplice had formulated a plan to kill the victim, who was a known drug dealer. The two men arrived at the victim's home in the early morning hours, both carrying guns. The fact that they entered so early in the morning is evidence that they planned the time and place of the murder, knowing that Jones would be gone and Nelson would still be there. And

although arriving with guns, in and of itself, would not be enough to prove prior calculation and design, we have more than that in this case. Thus, the fact that the two men took guns to the victim's home is evidence of prior calculation and design when considering the totality of the circumstances in this case.

{¶80} Further, the men entered the back of the home, walked up the stairs, and into S.J.'s bedroom. One of the men asked S.J. if there was any money in the home. The other man went back downstairs and fought with the victim. And then when the victim went upstairs, that man yelled for the other man to "help." The man in the bedroom said to the children in the room, "don't scream because you probably about to hear a lot of shooting." The man then walked out of the bedroom and immediately shot the victim, who was standing at the top of the stairs, in the head. This evidence, of such a cold-blooded killing, circumstantially indicates aforethought, not a sudden eruption of events. Thus, we find that a rational trier of fact may infer prior calculation and design beyond a reasonable doubt.

C. *Aggravated Burglary and Firearm Specifications*

{¶81} Orr further argues that the state failed to present sufficient evidence to convict him of aggravated burglary and the firearm specifications attached to the aggravated burglary.

{¶82} R.C. 2911.11(A)(2) provides that

No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any

criminal offense, if * * * [t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

**{¶83}** R.C. 2941.141 requires proof beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense."

**{¶84}** R.C. 2941.145 requires proof beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

**{¶85}** Orr's entire argument on this issue is that the state failed to present sufficient evidence of "his intent to commit a criminal offense" because "the two males were separated, no guidance, instruction, exertion of control or communication occurred between the two males." Because of this, Orr contends that there was no evidence that he possessed or controlled a deadly weapon or dangerous ordnance.

**{¶86}** We already addressed the evidence regarding complicity at the outset of our sufficiency analysis. There was more than enough evidence presented to establish that Orr aided and abetted his accomplice in committing the crimes for which he was convicted. Further, S.J. testified that she woke up to both intruders pointing a gun at her face. Thus, Orr's arguments regarding aggravated burglary and the attached firearm specifications are without merit.

**{¶87}** Accordingly, Orr's fourth assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

**{¶88}** In his third assignment of error and his tenth supplemental assignment of error, Orr argues that his convictions were against the manifest weight of the evidence.

**{¶89}** Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

**{¶90}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶91}** Orr argues that despite his DNA being found on the black half-face mask, there was no evidence that he was actually in the victim's home. He further argues that there was no evidence that he possessed the cell phone at the time of the murder.

**{¶92}** We disagree with Orr that the factfinder lost its way in convicting him. After reviewing the entire record, weighing all of the evidence and all reasonable inferences, considering the credibility of witnesses and determining whether in resolving any conflicts in the evidence, we conclude that this is not the "exceptional case" where the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Indeed, the circumstantial evidence placing Orr at the scene is quite convincing.

**{¶93}** Orr's third assignment of error and his tenth supplemental assignment of error are overruled.

## Subject Matter Jurisdiction

**{¶94}** In his first supplemental assignment of error, Orr argues that the trial court lacked subject matter jurisdiction over him.

**{¶95}** R.C. 2901.11(A)(1) grants jurisdiction to Ohio courts over criminal offenses which occur in Ohio. The statute provides that "[a] person is subject to criminal prosecution and punishment in this state if * * * the person commits an offense under the laws of this state, any element of which takes place in the state." In the instant case, Orr was indicted by the Cuyahoga County Grand Jury on six counts, involving offenses that occurred in Ohio. Accordingly, pursuant to R.C. 2901.11, the trial court had jurisdiction to proceed on all counts. Further, the Cuyahoga County Common Pleas Court was the proper venue to try the case, as R.C. 2901.12(A) provides that "the trial of a criminal case

in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed."

{¶96} A common pleas court has original jurisdiction in felony cases under R.C. 2931.03, and its jurisdiction is invoked by the return of a proper indictment. *Click v. Eckle*, 174 Ohio St. 88, 89, 186 N.E.2d 731 (1962). The record reflects that Orr was prosecuted by proper indictment filed in the Cuyahoga County Court of Common Pleas. Moreover, Orr is not even claiming that the indictment was invalid in any way. Therefore, the trial court had jurisdiction over Orr's case.

{¶97} Orr's first supplemental assignment of error is overruled.

### Confrontation Clause

{¶98} In his third supplemental assignment of error, Orr argues that Detective Entenok's "unsworn, untested testimonial hearsay" violated his confrontation rights under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Orr's arguments seem to be based upon the fact that Detective Entenok testified that a black half-face mask was found at the scene, but he could not recall "the exact origin of the statement." Detective Entenok testified in court, under oath, and was cross-examined extensively by Orr. Thus, there were no confrontation issues.

{¶99} Orr's third supplemental assignment of error is overruled.

### Speedy Trial

{¶100} In his fifth and sixth supplemental assignments of error, Orr argues that his constitutional and statutory speedy-trial rights were violated. Orr contends that because

he was held in jail from the date of his March 12, 2012 arrest, the triple-count provision applies, and his speedy-trial time was up on July 24, 2012.

{¶101} The right to a speedy trial is guaranteed to all state criminal defendants by the Sixth and Fourteenth Amendments to the United States Constitution, and by Section 10, Article I, of the Ohio Constitution. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). When reviewing a speedy-trial issue, an appellate court must calculate the number of days chargeable to either party and determine whether the appellant was properly brought to trial within the time limits set forth in R.C. 2945.71. *State v. Riley*, 162 Ohio App.3d 730, 2005-Ohio-4337, 834 N.E.2d 887, ¶ 19 (12th Dist.).

{¶102} R.C. 2945.71(C)(2) governs the statutory time within which a defendant must be brought to trial for a felony offense and provides in relevant part that: "A person against whom a charge of felony is pending * * *[s]hall be brought to trial within two hundred seventy days after the person's arrest."

{¶103} R.C. 2945.71(E) provides, "[f]or purposes of computing time * * *, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days[.]"

{¶104} The time to bring a defendant to trial can be extended for any of the reasons. In particular, R.C. 2945.72 provides in pertinent part that "[t]he time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following: * * * any period of delay occasioned by the neglect or improper act of the accused[,] and * * * [t]he period of any continuance

granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"    R.C. 2945.72(D) and (H).

{¶105} Generally, when computing how much time has run against the state under R.C. 2945.71, we begin with the day after the accused was arrested.    *State v. Broughton*, 62 Ohio St.3d 253, 260, 581 N.E.2d 541 (1991).    Orr was arrested on March 12, 2012 and, thus, his speedy-trial time began to run on March 13, 2012.

{¶106} Orr was not brought to trial until July 23, 2013.    Within this time, however, Orr moved to continue the case at least 16 times, moved to discharge his defense counsel — two sets of attorneys — twice, filed *over* 100 motions pro se with the trial court (this does not include motions filed by his two sets of defense attorneys, which would also toll the time despite Orr's arguments to the contrary), filed numerous "objections" and "notices" with the clerk's office, and underwent competency and sanity evaluations.    After our independent counting of the record, the state was well within the statutory time to bring Orr to trial.

{¶107} We also find that Orr's constitutional right to a speedy trial was not violated.    In examining a constitutional claim on speedy-trial grounds, the statutory time requirements of R.C. 2945.71 to 2945.73 are not relevant; instead, courts should employ the balancing test enunciated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).    The test includes considering (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his or her

right to a speedy trial, and (4) the prejudice to the defendant. *Id*. at 530-532; *see also State v. Triplett*, 78 Ohio St.3d 566, 679 N.E.2d 290 (1997).

{¶108} The length of delay is the triggering mechanism. *State v. Kraus*, 2d Dist. Greene No. 2011-CA-35, 2013-Ohio-393, ¶ 23, citing *Barker*. "'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Id*., quoting *Barker*. "Generally, courts have found that a delay approaching one year becomes 'presumptively prejudicial.'" *State v. Winn*, 8th Dist. Cuyahoga No. 98172, 2012-Ohio-5888, ¶ 44, citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1.

{¶109} In *Winn*, however, this court determined that over a year and a half between the arrest and the defendant's trial was not presumptively prejudicial because the defendant "requested numerous continuances [and] filed many motions." *Winn* at ¶ 44. This court found that "in light of the totality of the circumstances, we are not persuaded that the delay was so presumptively prejudicial as to trigger consideration of the *Barker* factors." *Id.* Just as in *Winn*, we are not persuaded that the delay in Orr's case was presumptively prejudicial.

{¶110} "The rationale supporting [the speedy-trial statute] was to prevent inexcusable delays caused by indolence within the judicial system." *State v. Ladd*, 56 Ohio St.2d 197, 200, 383 N.E.2d 579 (1978). After reviewing the record and docket in this case, there is nothing before us that suggests that indolence in the judicial system had anything at all to do with the delay in Orr's trial.

**{¶111}** Accordingly, Orr's fifth and sixth supplemental assignments of error are overruled.

Prosecutorial Misconduct

**{¶112}** In his ninth supplemental assignment of error, Orr argues that the prosecutor committed misconduct in his closing arguments.

**{¶113}** The test for prosecutorial misconduct in a closing argument is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "A new trial will be ordered where the outcome of the trial would clearly have been different but for the alleged misconduct." *State v. Wilson*, 8th Dist. Cuyahoga No. 91971, 2010-Ohio-1196, ¶ 57, citing *State v. Brewer*, 8th Dist. Cuyahoga No. 67782, 1995 Ohio App. LEXIS 2604 (June 22, 1995).

**{¶114}** Orr quotes the prosecutor's closing arguments at length, claiming they were "far beyond the scope of the records and claim facts that were not substantiated by evidence." We strongly disagree. We have reviewed the prosecutor's closing arguments in their entirety and find no improper remarks. Indeed, our analysis on Orr's assignments of error dealing with sufficiency and manifest weight of the evidence contain each fact that the prosecutor referred to in his closing arguments.

**{¶115}** Orr's ninth supplemental assignment of error is overruled.

**{¶116}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., J., and
TIM McCORMACK, J., CONCUR