[Cite as *State v. Durham*, 2016-Ohio-691.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102654**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BRYAN DURHAM

DEFENDANT-APPELLANT

### JUDGMENT:
AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585105-A

**BEFORE:** Laster Mays, J., Keough, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** February 25, 2016

-i-

**ATTORNEY FOR APPELLANT**

Stephen L. Miles
20800 Center Ridge Road, Suite 405
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy McGinty
Cuyahoga County Prosecutor

By:    Andrew J. Santoli
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

## I.    INTRODUCTION

{¶1}    Defendant-appellant Bryan A. Durham ("Durham") appeals his conviction

and sentence of life with parole eligibility at 30 years for aggravated murder with a

consecutive 36-month sentence for the 3-year firearm specification, and a concurrent

36-month sentence for having a weapon while under disability.  Durham argues that his

counsel was ineffective for failure to file motions to suppress his videotaped interview and

evidence derived from the seizure of his automobile.  Durham also challenges the

sufficiency and manifest weight of the evidence. We vacate the aggravated murder

conviction and sentence, and remand for resentencing.

## II.    BACKGROUND AND FACTS

{¶2}   In May 2014, Durham was indicted by the Cuyahoga County Grand Jury for

the following counts relating to the death of Herman Coleman ("Coleman"):

> (1) aggravated murder (R.C. 2903.01(A)) with a 1-year firearm specification
> (R.C. 2941.141(A)) and a 3-year firearm specification (R.C. 2941.145(A));
>
> (2) murder (R.C. 2903.02(B)) with a 1- and 3-year firearm specification;
>
> (3)   felonious assault (R.C. 2903.11(A)(1)) with a 1- and 3-year firearm
> specification, a notice of prior conviction (R.C. 2929.13(F)(6)), a repeat
> violent offender specification (R.C. 2941.149(A)) in CR-92-283608, and a
> notice of prior conviction and repeat violent offender specification in
> CR-92-278596;
> (4)   felonious assault (R.C.2903.11(A)(2)) with a 1- and 3-year firearm
> specification, 2 notices of prior conviction, and 2 repeat violent offender
> specifications; and
>
> (5) having a weapon while under disability (R.C. 2923.13(A)(2)).

{¶3}    On January 27, 2015, Durham was convicted by the trial court, after waiving a jury trial on the issue, of having a weapon while under disability.  He was convicted by the jury on all remaining counts, with the trial court determining that the repeat violent offender specifications would be considered at sentencing.

{¶4} On January 28, 2015, the parties agreed at the sentencing that counts 1, 2, 3, and 4 are allied offenses and that the 1- and 3-year firearm specifications merged.  The state elected to have Durham sentenced on the aggravated murder count with 3-year firearm specification,  for which Durham was sentenced to life with parole at 30 years plus a consecutive 3 years for the firearm specification.  He received a concurrent 36-month sentence on count 5, having a weapon while under disability, with postrelease control advisement.  Defendant timely appeals his convictions for aggravated murder, murder, and felonious assault.

**A. Trial**

{¶5} At the trial, the state called approximately 29 witnesses and introduced several hundred exhibits. We summarize the evidence relevant to the issues raised in this appeal.

{¶6} On April 15, 2014, the body of Herman Coleman ("Coleman") was discovered by his ex-wife, Darlene Ware-Coleman ("Darlene"), and friends Anthony Henderson ("Henderson"), and Jay Dempsey ("Dempsey"). The body was located behind a commercial building with a fenced yard, located at 16826 Miles Avenue, Cleveland, Ohio ("the property"). Coleman purchased the property in 2013 to start a tow truck business to supplement his regular income as a pharmacy technician and to support him during retirement. The coroner determined that Coleman was killed by a close range gunshot to the lower left jaw and calculated the time of death to be less than 24 hours from the coroner's arrival at the scene at 12:20 p.m. on April 15, 2014.

{¶7} According to Darlene, a 30-year postal service employee, though divorced, she and Coleman maintained a close relationship. After leaving the pharmacy, Coleman's habit was to have dinner at Darlene's house with Darlene and their daughter.

{¶8} Coleman hired Durham in 2013 to repair and rehabilitate the property in exchange for allowing Durham use of the warehouse to store his commercial construction vehicles and equipment. Coleman began to express his disappointment with Durham's conduct in March 2014 when Durham and his friend, Marcel Caver ("Caver"), went to a warehouse owned by a longtime friend of Coleman, James "Boochie" Willis ("Willis"), alleging that Caver's stolen truck was there ("truck incident"). The police were called but

were unable to enter without a warrant. Someone broke through the door, but the truck was not located. Darlene said that Durham wanted Coleman to get involved and that Durham was upset because Coleman refused.

{¶9} Coleman also complained to Darlene that Durham and his friends would hang out at the property all hours of the day and night drinking alcohol. On April 14, 2014, Coleman told Darlene that he was going to ask Durham to move out, a decision embraced by Darlene. Coleman left Darlene's house about 7:30 p.m. to meet with Durham at the property.

{¶10} Darlene and Coleman normally telephoned each other at bed time and in the mornings; however, Darlene was unable to reach Coleman that evening and her attempts throughout the next morning were unfruitful. She left work early to go to the property. Darlene saw Coleman's white pick-up truck behind the locked building gate and called Coleman's brother, John Coleman ("John").

{¶11} John called Dempsey, and John went to check Coleman's house while Dempsey headed to the property to meet Darlene. Henderson was at the property when Dempsey arrived.

{¶12} On his way to the property, Henderson called Durham to ask if he had seen Coleman and to request that Durham open the locked gate, advising him that Darlene could see Coleman's truck behind the fence. Durham said he had seen Coleman the night before but that Coleman left when it began raining. He also said that he was unable to come to unlock the fence because he was going to pick up his drain snake at a pawn shop.

**{¶13}** Dempsey showed Darlene and Henderson how to access the property through an adjacent fence. They found Coleman's body in the snow at the back of the property by the dumpsters, and called 911. Dempsey did not see any footprints in the snow.

**{¶14}** John arrived at the scene concurrently with Cleveland Police Department ("CPD") Officer Lee Davis ("Officer Davis"), and another officer. They climbed the fence and went to the back of the property where Coleman's body was lying. Later at the scene, John saw Durham sitting in the back of a police car and told him that they needed to talk. Durham focused on his cell phone and shook his head. John testified on cross-examination that his brother and Durham had keys to the property and he did not know if a third individual, Brian Gregory ("Gregory"),[1] had a key also.

**{¶15}** Officer Davis went to high school with Coleman, and Durham was the half-brother of Officer Davis's deceased cousin. Officer Davis heard a "man down" dispatch broadcast and recognized the property address and responded with his partner. Durham called Officer Davis while he was on the way to the scene and told him something had happened at the shop. Officer Davis said he and John arrived concurrently and together ran to the area. He observed snow on Coleman's truck and body, but his primary focus was to prevent John, who was very emotional, from disturbing the scene.

---

[1] Brian Gregory, also known as Brian Brooks and "Meathead."

{¶16} Officer Davis called Durham and told him that he needed to come to the property, but did not tell him Coleman had been located. The first time he saw Durham was later that morning when Durham was sitting in the back of a police car.

{¶17} Officer Davis also testified regarding the truck incident that transpired several weeks earlier involving Durham, Caver, Gerome Hardy ("Hardy"), who is also a relative of Officer Davis, and an unknown man. Officer Davis called a zone car from the CPD Third District who arrived at the scene and said there was nothing they could do except make a report. Officer Davis left them at the location with the zone car. He did not know why Caver thought his vehicle was there, did not know who owned the property, and there was no mention of Coleman.

{¶18} Thomas Ciula ("Ciula"), a forensic video specialist with CPD, accompanied CPD Detective Tom Lynch ("Detective Lynch") to the O'Reilly Auto Parts Store located at the corner of Lee Road and Miles Avenue on April 22, 2014, to download and view the security video for April 14, 2014 from 4:00 to 10:00 p.m. that depicted the Lee and Miles intersection ("Lee and Miles").

{¶19} Ciula said that the fact the video clock was 4 years, 258 days, 3 hours and 47 minutes behind was not an unusual occurrence and his computer software was designed to sync the information to provide an accurate time reference for video review. Ciula walked through the processing and chain of custody. He delivered the results to Detective Lynch that depicted traffic activities at Lee and Miles from 7:55 to 8:03 p.m. on April 14, 2014. Ciula had not been given information about the case.

{¶20} Officer Ryan McMahon ("Officer McMahon") responded to a dispatch call to the crime scene to assist officers and emergency medical service personnel with securing the scene. Officer Eddie Robinson ("Officer Robinson") told Officer McMahon that several family members informed him that Durham was on the scene, and that Durham was the last person to see Coleman alive. Officer McMahon approached Durham, who was standing away from the family, and asked whether Durham would accompany him to speak with homicide detectives since he might be a witness. Durham agreed.

{¶21} Durham accompanied Officer McMahon to the police car to wait due to the cold weather. Officer McMahon said Durham entered voluntarily and was driven downtown to meet with homicide detectives. After the interview, Durham was driven to the Fourth District police station and released.

{¶22} Gerald Welker ("Welker") testified that he had known Coleman for three years and Durham for one and one-half. He had been to the property several times to work on equipment and perform bulldozing services. Welker became aware of issues between Coleman and Durham a couple of weeks before the murder. Coleman told Welker that he and Durham were in conflict about the clutter posed by Durham's dumpsters, rock piles, and foliage. Welker advised Coleman to give Durham 30-days to clean up or move out. He was also aware that Coleman did not like Durham and his friends drinking and hanging out at the property.

{¶23} Officer Martin Tate ("Officer Tate") accompanied Officer McMahon to the scene and assisted with securing the location. Officer Tate was sitting in the front seat of

the zone car doing paperwork when Durham entered the back seat. Officer Tate's understanding was that Durham was going to be driven downtown to speak with detectives because he was one of the last people to see Coleman alive.

{¶24} Officer Tate overheard Durham telling someone via cell phone that Durham believed Coleman had been shot in the neck. The statement attracted Officer Tate's attention because he had been informed of the cause of death about 30 minutes earlier. Prior to that point, it had not been established.

{¶25} Officer Tate asked Durham how he knew that Coleman had been shot in the neck. Durham said he overheard a male talking about it, but he did not know who and could not identify the person. At that point, Durham had been in the car for approximately 15 to 20 minutes and was not under arrest. There was no further conversation between Officer Tate and Durham.

{¶26} Detective James Raynard ("Detective Raynard") with CPD Crime Scene Unit took a number of crime-scene photos that were introduced as evidence. He described the content of the photos including the presence of snow covering the decedent. A close up of the decedent's head showed suspected blood on the face, clothing, and snow. He testified the temperature dropped from 72 degrees on April 14, 2014, to 32 degrees on April 15, 2014.

{¶27} A copper bullet shell was located two feet north and three feet and ten inches east of the decedent's ankle and a plastic tipped cigar was on the ground near the body. Close-up photos of the decedent's face showed injuries to the left side of his face and neck. A cell phone was in the decedent's pocket and a ball cap was discovered under

the snow when the body was moved.   Additional photos showed beer and alcohol bottles in various locations.

{¶28}   Detective Raynard also took photos on April 21, 2014, as a result of a search warrant for Durham's impounded 2001 green Ford Taurus.  The car contained a number of items.   Detective Raynard also conducted the gunshot residue collection ("GSR").  He explained the process and chain of custody but did not participate in the testing of collected particles.

{¶29} Gregory Parker ("Parker") testified that he knew Durham and a number of his friends.   Parker met Coleman about two years before the incident. On April 14, 2014, Parker went to the property to pick up Clarence "Pudgie" Bryant ("Bryant") who was driving Parker's white truck.   Parker planned to drop the truck off at Bryant's house. Afterwards, Bryant was to ride with Parker to a westside car lot owned by Parker.

{¶30}   Parker arrived at the property about 5:00 p.m. Bryant was already there. Several people were around, talking and drinking alcohol, but Parker could not recall who. Parker left after about 40 minutes to meet Bryant who left to play the lottery.

{¶31}   They dropped the white truck off and returned to the property in Parker's black truck at about 6:00 p.m.   Parker believed Durham was driving his 2001 Taurus that day.   There were more people at the property by that time. Tiant Nobles ("Nobles") and Wayne Ivory ("Ivory") were driving a red pick-up truck.   Uncle Charlie Durham ("Uncle Charlie") was driving a red dump truck, and Hardy was driving a red pick-up truck.

{¶32}   Parker testified that he pulled into the driveway behind Coleman who was just exiting his white truck.   Coleman had Bryant pull Coleman's truck further into the

driveway to create more room for Parker. Parker initially observed Coleman and Durham speaking in an area toward the back and right of the property. He did not hear any yelling and the two did not appear animated.

{¶33} Parker was having a beer and a drink also and entered into the first one of the four truck bays at the property. He saw Nobles and Ivory talking outside by their pick-up truck.

{¶34} While Parker was walking around, he noticed that he could no longer see Durham and Coleman. He believed they went behind the property. Parker walked back inside and was standing with Bryant, Uncle Charlie, and Hardy when he heard a sound that he thought was a wooden board cracking or something falling, but Bryant said, "I know a gunshot when I hear it. That was a gunshot." (Tr. 1054.)

{¶35} The group walked out to the driveway and, as they began walking to the back of the property, Durham emerged from the back and walked toward them. Parker asked Durham twice what was going on and Durham did not respond. Bryant also said something to Durham who still did not respond. Bryant then said "let's get the hell out of here," and everyone proceeded to leave. (Tr. 1055.)

{¶36} Parker confirmed that the only people behind the property were Durham and Coleman and that he did not see Coleman emerge from behind the property. He saw Durham lock the gate as he and Bryant were preparing to pull off. Coleman's truck was the only vehicle left inside the locked gate except for Durham's Chevy Suburban that was already parked there.

**{¶37}** Parker identified the vehicles depicted in the O'Reilly video excerpt of Lee and Miles, (1) Nobles's and Ivory's red pick-up; (2) Uncle Charlie's red dump truck; (3) Parker's black truck; (4) Hardy's red pick-up truck, whose company logo was discernible; and (5) Durham's Taurus. Parker believed the time frame of 7:55 to 8:00 p.m. to be accurate. The next day, Parker was returning from work when he saw the crime scene. Bryant called him and told him that Coleman was dead. Parker did not voluntarily contact the police but met with the homicide detectives on April 15, 2014 or April 16, 2014, at their request, and made a written statement.

**{¶38}** Bryant testified to knowing Durham and Uncle Charlie for about 20 years, Parker for six years, Nobles and Ivory about 35 years, Hardy about six months, and Coleman for about six or seven months. Bryant frequently visited Durham at the property.

**{¶39}** Bryant arrived at the property about 9:00 or 10:00 a.m. on April 14, 2014, and worked with Durham to grease equipment and to break up old wooden pallets to burn. Bryant left to run an errand, returning about noon or 1:00 p.m. He, Durham, and Uncle Charlie began drinking a bottle of liquor, a six pack of beer, and eating lunch. Bryant was in and out of the property and so were various others. Several people stopped by around 4:00 and 5:00 p.m. Bryant drove Parker's white pick-up truck to the property about 4:30 p.m. and later left to play the lottery while Parker was still at the shop. Parker met him at the store; they dropped off the white truck and returned to the property.

**{¶40}** Bryant's description of those in attendance, and their vehicles, echoed those of Parker, except Bryant added that someone named Darryl was also present who he did not know. Another variance in recollection was that Bryant believed they returned to

the property about 20 minutes before 8:00 p.m. and Coleman was not there. He had another beer and a shot of liquor and socialized.

**{¶41}** Bryant said Coleman arrived about fifteen minutes later and pulled his truck by Parker's. Coleman walked inside, shook everyone's hand, and then he and Durham began talking and walked outside. Bryant said he was not drunk at that time but "was feeling good." (Tr. 1116.) The entire group was drinking, except for Coleman.

**{¶42}** Coleman and Durham were standing where everyone was parked when Coleman asked Bryant to, "move my truck right quick, and I'm going to holler at Bryan [Durham], so I ain't blocking and my truck to get hit [sic]. I just got the truck." (Tr. 1118.) Coleman and Durham were talking but not arguing. They moved into the doorway of the property and then went back outside. A few minutes later Bryant and the others "heard a pop" (tr. 1121) and were discussing whether it was the wood that was being broken and burned, or a gunshot. Bryant believed it sounded like a gunshot. Bryant went outside towards Parker's truck and said, "I'm the eff out of here." (Tr. 1123.)

**{¶43}** Bryant also confirmed Parker's account of Durham coming from the back of the property after the shot, and failing to respond to inquiries by the group about what was going on. He also saw everyone leaving and Durham close the gate.

**{¶44}** Bryant reviewed a crime scene video of the property. He recognized Coleman's truck but said he had not pulled the truck that far forward onto the property, that Durham's trailer should have been behind Coleman's truck, and stated the trailer was on the property when he left the night of the incident.

{¶45}  Bryant identified the vehicles in the O'Reilly video including Durham's Taurus.  He went home after the incident and began receiving calls in the morning about Coleman's death.  Hardy told him where Durham was and took Bryant there to see him that evening.  Bryant said that Durham touched Bryant's chest first, and commented about how things are "effed" up.  "He was, like, you know, man, you know, this is really messed up, but, you know, I want to trust you, but I don't know who to trust right now."  Bryant suggested that Durham contact a lawyer since people were saying he killed Coleman.  (Tr. 1136 and 1137.)

{¶46} Bryant gave statements to FBI Special Agent Doug Williams shortly after learning of Coleman's death on April 15, 2014, Detective Lynch on April 15, 2014, and a second statement to Detective Lynch in June 2014.  Bryant testified that his statements were consistent.

{¶47}  On cross-examination, Bryant said he helped Durham work on the property.  He corrected his earlier testimony that he went directly home after the incident because he and Parker went to Parker's car lot first, when he began calling Coleman.  Bryant said the time was around 8 or 9:00 p.m.

{¶48}  Bryant was questioned about "Meathead" and "Boochie" [2] who he mentioned in his written statements.  He replied that he ran into Meathead in May who told Durham he had been at the property on April 14, 2014, but Meathead was not there that evening and Bryant did not see him at any point that day.

---

[2]  Meathead and Boochie were later identified in the proceedings to be Brian Gregory, also known as Brian Rooks and "Meathead."  "Boochie's" given name was James Willis.

**{¶49}** CPD Detective Dwayne Duke ("Detective Duke") specializes in cell phone and computer forensic data extractions and converts the data into reports using proprietary software. He extracted data from Kyocera and ZTE cell phones owned by Coleman. The last outgoing call was made to Durham on April 14, 2014 at 7:34 p.m. for a 37-second duration.

**{¶50}** Officer Todd Wiles ("Officer Wiles"), a certified crime analyst, analyzes police reports and 911 calls mapping crimes for patterns and trends analyses. He performed an analysis of the data secured from Detective Lynch and the records subpoenaed from Verizon for Durham's cell phone, which included an itemized list of incoming and outgoing calls as well as cell tower information. From 5:53 p.m. forward, including the 7:34 p.m. incoming call from Coleman, the calls were picked up by the same cell tower, indicating the phone was stationery. After 8:24 p.m., the calls were handled by a different tower.

**{¶51}** Stefan Boseman ("Boseman") is co-owner of Uptown Towing & Recovery with Gregory. Boseman called Coleman "Uncle Herman." He met Coleman through the church when Boseman was a child, and said that Coleman was a positive influence and role model.

**{¶52}** Boseman met Durham when Coleman purchased the property. Durham would call Boseman to help him out at the property. He was there often and lived nearby. Boseman was given a key but was told to give it to Gregory because he was not responsible about locking up when he was away from the property.

**{¶53}** It was Boseman's experience that, whenever there was a difference of

opinion between Coleman and Durham, they would talk it through. He said that Durham always carried guns at the shop — a revolver and a semi-automatic.

{¶54} Boseman was not at the property on April 14, 2014. Durham called at about 6:00 p.m. that day to invite him to the property to hang out and drink but he did not go. His cousin called him the morning of April 15, 2014 and told him about Coleman's death. Boseman called Durham several times but was unable to reach him. Durham called him back and said Coleman had been murdered at the shop.

{¶55} Durham was usually at the property in the evenings where he and others would eat and drink alcohol. Gregory was there frequently along with Uncle Charlie, Durham, Bryant, and Pete Durham ("Pete"). Coleman sometimes arrived after his day job, but did not stay long and did not drink.

{¶56} Gregory testified that he began storing his tow truck at the property about 18 months prior to the incident. Durham gave the property keys to Gregory as the result of an "altercation" between Durham and Boseman since Gregory did most of the tow truck driving. Coleman and Durham had door openers that provided access to the property. The keys only provided access to the gate to get into the yard. Gregory had a good relationship with Coleman and would sometimes ride to towing jobs with him or respond to calls in his own truck in Coleman's stead.

{¶57} Gregory went to the property on April 14, 2014 to retrieve tools from his truck at about 2:00 or 3:00 p.m. Durham was there with two men whose names Gregory did not know but who he identified from a photo exhibit as Nobles and Ivory. Durham

told Gregory that he was going to move his things out of the property and that his plow truck had already been moved.

{¶58} As substantiated by cell phone records, Gregory and Coleman talked several times that morning about resolving the issues between Durham and Coleman and how to move forward. Gregory advised Coleman to have a talk with Durham, and Coleman responded he was going to the property later that day. Gregory told Coleman to call him before he went to the property, but Coleman did not. Gregory returned to the property some time between 5:00 and 7:00 p.m. to return his tools. He was there for about five minutes and did not see Coleman.

{¶59} At 4:00 or 5:00 a.m., Gregory rode his son's bicycle to the property to get his tools because his wife had a flat tire and needed to drive to work. It was raining lightly. Both locks were on the gate. He unlocked the gate and started his truck that was in between the dumpsters and the back wall. He saw Coleman's truck, which he thought was odd, but he did not see Coleman's body. Gregory thought Coleman may have towed a car to Canton, which he had done before, though Coleman usually called Gregory to ride with him.

{¶60} Gregory put his bike onto the tow truck and left, relocking the gate. He did not see Coleman and did not look for him. He fixed the tire, went to bed, and was awakened by phone calls telling him that Coleman was dead. Gregory said he was shocked, and recalled receiving a call from Durham who asked if he knew Coleman was dead.

{¶61} Gregory also testified about the truck incident. He towed a truck that was parked in front of Willis's place to Caver's place on E. 93rd at Durham's request. Gregory met Willis previously but did not really know him.

{¶62} The truck situation was a point of dispute between Durham and Coleman. Durham allegedly called Coleman after "they apparently or supposedly tried to barge their way into Boochie's establishment, Mr. Durham supposedly had called Herman afterwards and asked Herman to call your friend Boochie, and tell him to let my friend have his truck." (Tr. 1339.) Gregory later informed John of the situation.

{¶63} Lisa Przepszny ("Przepszny") worked in the Trace Evidence Department of the Cuyahoga County Regional Forensic Science Laboratory. Przepszny examined the decedent's hands, body, clothing, and other crime scene evidence and issued a report. She determined that, based on the wound, the decedent was in close proximity to the weapon, and there was no evidence that his hands were in contact with a metal object such as a gun. There was blood consistent with the decedent's injuries on his clothing. DNA sample swabs were taken and forwarded to the DNA Department.

{¶64} Przepszny also tested the GSR samples from Durham's vehicle. Spherical, molten particles containing lead, barium, and antimony are indicative of gunshot residue and were located on the driver's interior armrest, door handle, door release, and upper panel. Residue was also located from other areas including the driver's seat, headrest, and arm rest samples. Other sources for the presence of the chemicals were considered but ruled out based on the chemical

constituent combination and shape of the particles. The Trace Evidence Department also

examined and submitted for DNA testing a ball cap, vodka bottle, cranberry juice bottles, ten beer bottles, and a plastic cup taken from the vehicle.

{¶65} Przepszny testified on cross-examination that the samples were tested between June 18 and June 27, 2014. She had been informed that the suspect worked with vehicles at a garage and was involved with construction but not of his involvement with the scrapping business. There was also no indication or information that the car had been driven and parked by a police officer at some point or entered into by a tow truck driver. Przepszny reiterated on redirect that the shape of the particles and combination of chemicals indicated that the particles were gunshot residue.

{¶66} Sandra Pankey testified that she met Durham in December 2013, when he was sent to her home by the previous owner to repair her plumbing. They ultimately began an intimate relationship and he stopped by to visit a few times a week. Her residence was located near Judson and Lee Roads, a few blocks from Miles and Lee.

{¶67} On April 14, 2014, Pankey went to bed early at around 7:00 p.m. She was awakened by her children about 8:43 p.m. because their paternal grandmother called, but she did not recall speaking with her and dozed back off. Durham was not at her home at that time.

{¶68} Durham arrived about 15 minutes later. Pankey had difficulty going back to sleep because Durham was in and out of the bathroom, located just a few feet from her bedroom, running water. Durham told her that he was not feeling well because he had been drinking with Uncle Charlie at the property. Pankey had no idea what Durham was doing in the bathroom.

{¶69}   Durham told her that his clothes, which were balled up in the corner by the door, smelled like smoke and asked her to wash them.   She went back to sleep but, due to Durham's persistence, eventually took the clothes to the basement to wash them at about 1:00 a.m.   She washed a pair of socks, underwear, white "wife beater" sleeveless undershirt, white thermal shirt and pants, fleece-lined blue jeans, orange sweater with a "Perfect Concrete" logo, and his jacket and hat.   The jacket and hat were already in the basement sanitary basin.   Durham had never asked her to wash his clothing before.   She did not see anything unusual on the clothing but did not check them.

{¶70}   Durham's behavior that night was not typical.   He usually took his shoes off when he entered her home, washed his hands, placed his coat on the back of a dining room chair and hung his pants on the door knob or door frame. It was also his habit to ask for something to eat but he did not want anything that evening.   There was no attempt at intimacy, which she testified usually occurred about 99 percent of the time.

{¶71} Durham's Ford Taurus was parked behind her vehicle in the morning. Pankey left the house about 10:00 a.m. and passed the crime scene.   She called Durham to inquire and he told her that Coleman was dead and the police were questioning everyone who had a key.   He said he was sitting in a police car at the time.   They talked for about two minutes.   Durham later called her about 7:00 p.m. saying he needed a ride from the Fourth District because the police kept his car.

{¶72} Durham told Pankey that he gave her information to the police and that they would probably contact her to ask what time he had arrived at her home, about his clothes, and whether she had ever seen him with a gun.   On the subject of the time, she stated, "I

just through [sic] out a time.  I said, Weren't you over about 9:30?  He's, like No. He's like, if you say that, I'm hit."  (Tr. 1422.)

{¶73}  He told her that he arrived at her home about 6:00 p.m., that she was to deny washing his clothes and he brought up the subject of a firearm. Pankey said that she had seen Durham with a firearm numerous times, but the gun was always in his pants, hanging on a door knob or frame, so she did not see the entire gun and could not identify it.

{¶74}  Durham and Pankey returned to her home and a heavy set dark-skinned guy with glasses came by who she identified from a photo to be Bryant.   Durham went outside and walked away with Bryant.   He returned alone about 11:00 p.m. driving a black Solara with a 30-day tag. Durham asked her whether she thought that he acted differently when he arrived on April 14 and she said that he had.

{¶75} On April 20, 2014, Pankey met with homicide detectives and signed a statement.  She said that Durham did not exhibit any emotion when he told her that Coleman was dead. Pankey did not speak with Durham after meeting with detectives. Pankey's testimony on cross-examination was consistent with that on direct.

{¶76}  Laura Evans, M.S. ("Evans"), a forensic DNA analyst at the Cuyahoga County Medical Examiner's office, examined items of evidence for the Herman Coleman case and issued a report.  The examination included DNA buccal swabs from Bryant, Parker, and Durham.  Additional swabs were submitted for Nobles, Uncle Charlie, and Ivory in October 2014.

{¶77}  The blood under Coleman's fingernails was his own. The alcohol and

several beer bottles from Durham's auto contained DNA from Parker and Bryant. One beer bottle contained DNA from Durham. Other items contained DNA for persons unknown. There was no DNA detected for Nobles, Charlie Durham, and Ivory.

{¶78} The steering wheel, driver's door interior, handle release and gearshift of Coleman's truck revealed DNA from Coleman and Bryant. The DNA from the Lipton ball cap found at the crime scene belonged to Coleman.

{¶79} Hardy, Durham's stepbrother, testified that he also referred to Charlie Durham as "Uncle Charlie." Hardy, Coleman, and John had known each other for about 48 years. Hardy did not know Boseman, Nobles, Ivory, or Parker though he had heard some of their names. He had also heard of, and seen, Gregory and Bryant, but was not acquainted with them.

{¶80} Hardy visited the property several times and stored his motorcycle there two or three days before the murder. Hardy observed several others at the property during his visits but he did not know them. He arrived at the property about 3:30 or 4:00 p.m. on April 14, 2014. He saw Uncle Charlie, Durham, and a guy who he believed was called "Pudgie" there. (Tr. 1500.) They were all sitting around drinking vodka and beer.

{¶81} It began to get chilly so they broke up wooden pallets for fuel and started a fire in the gas burner. Others arrived while he was there and Coleman arrived later. At that point, Hardy believed there were about nine people present including Nobles and Parker, whom he identified from photo evidence.

{¶82} Hardy met Coleman outside of the property. Coleman hugged him, told him he was there to speak with Durham, and they entered the building together. Coleman

began speaking with Durham. When Hardy turned around a little later, he did not see them and assumed they went outside. Hardy said he began running his motorcycle because he liked to hear it run. They continued to drink and burn wood. Hardy and Uncle Charlie were the last ones in the garage. He said he did not hear a gunshot over the sound of his motorcycle.

{¶83} Bryant came into the garage and told everyone to get out, so Hardy left because, "when somebody tells you to get the [f***] out, you get the [f***] out." (Tr. 1509.) He was the first to pull out and, circled back around to check on Uncle Charlie who he saw leaving the area. Bryant also observed Durham leaving the property in his Taurus.

{¶84} Hardy reviewed the O'Reilly video, identified the vehicles that he recognized and thought that everyone left about 6:00 p.m., but admitted that it could have been almost 8:00 p.m. Hardy learned of Coleman's death the next morning when his cousin, Officer Davis, phoned him.

{¶85} Hardy said that he has seen Durham with a gun a number of times. He only testified because he was subpoenaed. After he left the property the night of the incident, he went home and did not return.

{¶86} Ivory testified that he and his brother, Nobles, went to school with Durham and had been friends for about 20 to 30 years. Ivory owns a landscaping business. Ivory and Nobles had been to the property a few times and had a few drinks with the group, but they did not go regularly.

{¶87} They went to the property on April 14, 2014, to pick up money from Durham for a trailer hitch that Ivory sold to him. They were riding in a red pick-up truck and parked at the side of the property facing Miles Avenue. It was the first time that Ivory had met Uncle Charlie, who was also at the property. In reviewing photo evidence, Ivory recognized that Bryant and Parker were also present.

{¶88} Ivory thought the property belonged to Durham. He, Nobles and Uncle Charlie were in the bay area talking and drinking. In addition to Bryant and Parker, others were present but he could not say who they were. At some point, someone said loudly that everyone needed to "get the F out of here." (Tr. 1550.) The person sounded serious and Ivory did not know who said it or why. He and his brother left along with the others. He did not collect his money from Durham. Ivory did not recall seeing Coleman's truck in the driveway. He did not hear a gunshot and thinks he recalled a motorcycle engine running.

{¶89} Ivory and Nobles went to Nobles's house after they left the building. Nobles said that something must have happened since they had to "get up and go leave like that." (Tr. 1559.) They talked a while and Ivory left. Bryant told him several days later that someone was killed that night at the building. Ivory talked with the police when contacted in October 2014.

{¶90} The majority of Nobles's testimony was consistent with that of his brother, Ivory. However, Nobles did not recall a motorcyle engine. Nobles also said that as he, Uncle Charlie, Ivory, and Bryant were exiting the building, he saw Durham coming toward them from the back part of the property. Nobles asked Durham whether he was

"straight." Durham responded, "Yeah, I'm okay." (Tr. 1587 and 1588.) Nobles and his brother were the first to leave, and Nobles did not recall seeing Durham after that.

{¶91} Nobles called Durham to check on him about 8:43 p.m. Durham said that he was okay. Ivory was still with Nobles at the time. Parker and Bryant stopped by Nobles's house about 9:00 or 10:00 p.m. and the four of them talked about the gunshot, what happened that night and discussed the issue that had arisen between Coleman and Durham regarding the truck incident. Nobles learned about the murder the next morning. He spoke with detectives and made a statement when contacted a few months after the homicide.

{¶92} Caver owned a construction and concrete company and landscaping business. Caver's recollection was often vague, evasive, and ambiguous. He elaborated on the truck incident.

{¶93} Two years prior, a dump truck was stolen from Caver. He received a phone call that his truck had been located. Someone towed it to Caver's shop. Caver was not happy to recover the truck because it did not have wheels or doors and could not be used. In response to what role Durham played regarding the truck, Caver said Durham made a phone call in his presence to an unknown person and had a discussion about dumpsters, but there was no mention of Caver's dump truck.

{¶94} At some point, Durham took Caver somewhere on Woodland but he did not know whose place it was or when it occurred. They were there for about 15 minutes, and he did not see his truck.

**{¶95}** Caver was introduced to Coleman by Durham at a place called Mr. G's but that was his only contact with him. He was not aware of Coleman having anything to do with the dump truck. Caver was not at the building on April 14, 2014.

**{¶96}** Caver stated on cross-examination that he had only been to the place on E. 55th where his truck was located "that day." His former employee, Willie Jones, called him to tell him the truck was there. Durham was there. Officer Davis of the CPD and a couple of other officers also joined them. Caver does not remember any other calls being made.

**{¶97}** The next morning, Caver received a call from his brother informing him that his truck was parked on the street outside of the E. 55th address. It was towed to Caver's business location.

**{¶98}** Willis testified that he worked as a general contractor. Coleman was a life-long friend and they had been business partners for the past two years conducting tow truck operations and scrapping cars. Willis had also known Durham for about 20 years.

**{¶99}** Willis rents a warehouse at 6722 Bushnell. Durham called him and they met at the warehouse about four hours later, a couple of days before the murder. Durham had two guys with him. They first discussed the dumpsters that Durham was trying to sell and that Willis was considering buying.

**{¶100}** Durham told Willis that someone had seen his friend's dump truck at Willis's place. Willis told him there was no dump truck there. The guy with him, introduced as Caver, said someone told him the truck was there. Willis took Caver's number and said that, if he heard something about it, he would contact Marcel.

{¶101}   Durham wanted to enter the building and Willis refused.  Willis testified that Coleman was not there and had nothing to do with the situation.   Everyone left but Caver called Willis to say that things had gone too far and the police were involved. When Willis returned to the location, Durham and Caver were there, the door to the building had been kicked in, the locks had been cut and three police cars were leaving. The truck was not located. Willis boarded the door.   He denied ever having the truck and did not know how it ended up in front of his building the next day.

{¶102}   Willis called Coleman and told him what transpired. Coleman was surprised.  "Well, he couldn't believe it.  I mean, as far as not happy, he was not angry. He had no reason to be angry."  (Tr. 1649.)   Someone told Coleman that Durham planned to put a lien on the property "because of whatever they had going" (tr. 651), but Willis did not know any details.  Willis said Coleman had concerns about Durham.  Durham was failing to pay rent and did not pay a workman with the cash that Coleman had given him for that purpose.   Also, Coleman did not approve of Durham and his friends hanging out and drinking at the property while he was at work all day.

{¶103}   Willis talked with Coleman the day before the incident for about 30 minutes at 2:29 p.m. on the day of the incident.   Coleman planned to speak with Durham about going their separate ways and they discussed how Coleman should handle the situation.   Coleman usually called Willis in the morning before he went to work, but Willis did not hear from him the next morning.

{¶104}   Willis tried to call Coleman on April 15 but was unable to go to the property due to medical concerns.   When informed of Coleman's death, Willis talked with

Darlene and Henderson about Coleman's plan to speak with Durham the prior evening about moving out.

**{¶105}** Charisse Harper ("Harper") testified that she is the mother of Durham's two children. They met in 2012 and dated until February 2014. She purchased a gun during the summer of 2012, moved it around the house once and twice, but said she had not seen it since shortly after she purchased it.

**{¶106}** The state introduced evidence of the gun purchase that identified it as a Taurus 650, Serial No. EX 57488 .357 revolver. Harper also purchased bullets but said that she never loaded the gun. Harper purchased the gun for protection. Durham knew about the gun but never asked for or handled it. Harper never reported the gun missing.

**{¶107}** Uncle Charlie testified that he was 79 years old and performed construction work under the name Charlie Durham & Sons. Charlie is Durham's uncle. His recollection was somewhat sketchy.

**{¶108}** Uncle Charlie said that he met Coleman a couple of years earlier. Uncle Charlie arrived at the shop before noon on April 14, 2014. He was driving his red dump truck. He picked up Durham and they drove to a business to sell scrap metal, purchased liquor, beer, and chicken, and returned to the property about 1:00 p.m. He drank whiskey and said he did not recall seeing Durham until he left later in the day because it was time to go home.

**{¶109}** Uncle Charlie also said that he took a route that did not include Lee and Miles when he left the property, yet identified his vehicle at the intersection in the O'Reilly video. He heard of Coleman's murder the day after it occurred.

**{¶110}** Homicide Detective Tom Lynch testified that he and Detective Sandoval responded to the scene. He was informed that a body covered in snow was behind the property with an undetermined source of trauma to the head. The medical examiner arrived approximately one hour later and determined the source to be a gunshot wound to the neck.

**{¶111}** Detective Lynch was advised that Durham and Gregory were already at the scene and were seated in separate zone cars. He interviewed Gregory in the zone car. Detective Lynch gathered background information regarding Coleman, ownership of the property, the business arrangement, and the relationship with Durham from John and Gregory. Detective Lynch also talked with Henderson and Boseman. Gregory turned the property keys over also.

**{¶112}** The homicide lieutenant informed Detective Lynch that he had received a telephone call on the way to the scene. Based on that information, "[w]e felt that we definitely needed to speak with Mr. Durham." (Tr. 1756.)

**{¶113}** The detectives had the vehicles belonging to Coleman and Durham towed from the crime scene to an impound lot where they were placed in a secure building pending authorization to search. Personnel are not allowed to enter the vehicles due to the need to preserve evidence.

**{¶114}** Detective Lynch stated that since Durham was considered a potential suspect in a murder, state law requires that the suspect's interview be videotaped and that is why Durham was brought to the office. However, he said that Durham was not under arrest, could refuse to talk to them, and was free to leave at any time. Detectives Lynch

and Sandoval interviewed Durham for three hours. The trial court allowed a slightly redacted version of the videotape to be played for the jury, as stipulated by counsel for the parties.

{¶115} Pankey was interviewed as Durham's alibi witness. Interviews of the individuals who Durham said were present were conducted as well as interviews of additional persons who FBI special agent Doug Williams said were present. After obtaining statements by Bryant and Parker about the events of April 14, 2014, and the "issue" between Coleman and Durham, a warrant was issued for Durham's arrest on April 16, 2014, and a search warrant obtained for the Taurus on April 18, 2014.

{¶116} Durham's phone records for April 14, 2014, revealed calls from several of the individuals present at the property that day. In addition to Coleman's call to Durham at 7:34 p.m., there was: (1) a 45-second call from Durham to Bryant at 7:09 p.m.; (2) a 52-second call from Bryant to Durham at 8:24 p.m.; (3) a 34-second call from Bryant to Durham at 9:03 p.m.; and (4) a 34- second call from Bryant to Durham at 9:04 p.m. (Tr. 1793 and 1794.) There were quite a few calls the morning of April 15, the majority of which were with Bryant and others who were present on the previous day. After Coleman's call to Durham, Coleman's records showed several missed incoming calls from Bryant between 8:00 and 8:11 p.m. A number of people attempted to contact Coleman on April 15, 2014.

{¶117} Detective Lynch also testified that the bullet shattered when it impacted the decedent's jaw so the ballistics examiner was unable to determine whether it came from Harper's gun. The examiner was, however, able to determine that the copper casing

fragment discovered at the scene was consistent with a 9 millimeter, a .38 Special, or .357 Magnum caliber ammunition.

{¶118} Defense counsel emphasized that neither the gun nor the ammunition that Harper purchased had been located. Durham's counsel then challenged the relevance of the O'Reilly videotape time stamp, pointing out that if Coleman called Durham at 7:34 p.m., it would take 15 minutes or so to get from the property to Lee and Miles.

{¶119} Defense counsel objected to the admission of the three-hour videotaped interview, stating he believed that a rights form should have been executed under the circumstances. The court interrupted his recitation, asking whether counsel had filed a pretrial motion to suppress. Counsel responded, "I did not on this because I did not need to due to the fact that the contention from the State of Ohio is that it was voluntary, and I'm just bringing it to the Court's attention that in these discussions with my client, he did not feel it was voluntary." (Tr. 1682.)

{¶120} Durham subsequently told his attorney that he did not feel it was voluntary so counsel was posing the objection. The judge determined that the failure to file the motion to suppress constituted waiver of the issue and added that he had not heard any testimony that indicated the statement was involuntary.

{¶121} The videotaped interview with Durham was played for the jury. Durham appeared to be cooperative and talked freely. Distilled, Durham said that he and Coleman had known each other since they were six years old and talked about how he came to work with Coleman at the property. Durham discussed the truck incident and said that the decedent and others were involved in questionable activities. According to Durham,

Coleman told Durham that Willis and his friends were going to retaliate for the truck incident by breaking into the Miles property and that Durham had caused a lot of trouble. Durham said he did not know which one of the people involved in the truck incident could have killed Coleman.

{¶122} Coleman called Durham the morning of the homicide and told Durham they needed to talk and that he would see him at the property later. Durham said he and Uncle Charlie decided to leave the property about 6:00 p.m. or 6:30 p.m. Coleman called Durham to say he was coming to the property, but Durham told Coleman that he had waited for him all day and it was too late because he was no longer at the property. Durham said he went directly to Pankey's house and that is where he was the entire evening. When Durham and Uncle Charlie left, there was nobody else left at the property.

{¶123} Prior to closing arguments, the trial court denied Durham's motion for judgment of acquittal on all accounts pursuant to Crim.R. 29. The jury returned a verdict on January 23, 3015 finding Durham guilty on all counts. The trial court found Durham guilty on the remaining waived count. This appeal ensued.

## III. ASSIGNMENTS OF ERROR

{¶124} Durham proffers three assignments of error:

I.    The appellant received ineffective assistance of counsel.

II.   The appellant's convictions were not supported by sufficient evidence.

III.  The appellant's convictions were against the manifest weight of the evidence.

## IV. LAW AND ANALYSIS

### A. Weight and Sufficiency of the Evidence

{¶125}   We begin our analysis with assignment of error Nos. 2 and 3, which we combine for purposes of efficiency, challenging the sufficiency and manifest weight of the evidence.  Durham does not challenge the conviction for having a weapon while under disability.

{¶126}   For the reasons that follow, we find (1) that the evidence is sufficient to support, beyond a reasonable doubt, the convictions for murder and felonious assault and (2) the convictions for murder and felonious assault are not against the manifest weight. We further find that the evidence was not sufficient to prove beyond a reasonable doubt that Durham murdered Coleman with "prior calculation and design" and the conviction for aggravated murder under R.C. 2901.03(A) is reversed.

### 1. Standard of Review

{¶127} The Ohio Supreme Court has explained that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 5411 (1997). "Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. An appellate court, "may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins* at 386-387.

### a. Sufficiency of the Evidence

{¶128} The question of "whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 Ohio Op. 388, 124 N.E.2d 148." *Thompkins* at 386. It is "an inquiry about due process, * * * the resolution of which does not allow the court to weigh the evidence." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶129} In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime proven beyond a reasonable doubt." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386.

### b. Weight of the Evidence

{¶130} After consideration of whether the evidence is sufficient as a matter of law, a manifest weight inquiry looks at whether the evidence was substantial enough for a jury to reasonably conclude that all of the elements of the alleged crime have been proved beyond a reasonable doubt. The appellate court sits "as a thirteenth juror." *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court reviews the entire record, considers the credibility of the witnesses, weighs the evidence and all reasonable inferences, and determines whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Martin* at 175*; Leonard* at 68.

**{¶131}** Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. "It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's [Law Dictionary] 1594 [6 Ed.1990]." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

### 2. Analysis

#### a. Sufficiency

**{¶132}** Durham argues that the evidence was insufficient to support a conviction of aggravated murder, murder, felonious assault. We find merit to the argument as to the aggravated murder charge. We do not find merit to the argument as to the remaining charges.

**{¶133}** The Ohio aggravated murder statutes provides in pertinent part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2901.03(A). The phrase "prior calculation and design" is not statutorily defined but, instead, has been honed by subsequent case law. After a comprehensive review of legislative history and prior case law, the Ohio Supreme Court determined that "it is not possible to formulate a bright line test that emphatically distinguishes between the presence of absence of 'prior calculation and design.' Instead each case turns on the particular facts and evidence present at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20,

1997-Ohio-243, 676 N.E.2d 82.

**{¶134}** Prior calculation and design "requires 'more than a few moments of deliberation' and 'a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001).

**{¶135}** "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," but "momentary deliberation" is insufficient. Legislative Service Commission Comment to R.C. 2903.01; *see State v. Pierce*, 64 Ohio St.2d 281, 286-287, 18 O.O.3d 466, 469, 414 N.E.2d 1038, 1042 (1980). *State v. D'Ambrosio,* 67 Ohio St.3d 185, 196, 1993-Ohio-170, 616 N.E.2d 909.

**{¶136}** Methodologies the state may employ to prove prior calculation and design include proving:

> (1) "evidence of a preconceived plan leading up to the murder;" (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded;" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr,* 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the

victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

*State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 40.

**{¶137}** Additional factors to be considered are:

(1) Did the accused and the victim know each other, and if so, was that relationship strained?; (2) Did the accused give thought or preparation to choosing the murder weapon or murder site?; and (3) Was the act drawn out or "an almost spontaneous eruption of events?

*State v. Taylor*, 78 Ohio St.3d 15, 19, 1997-Ohio-243, 676 N.E.2d 82; *State v. Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 26.

**{¶138}** Considering the *Taylor* factors, John testified that the Coleman family moved down the street from Durham when they were teenagers so they knew each other for more than 20 years. Thus, the first factor has been met.

**{¶139}** The next two factors are combined for consideration. There is no indication that Durham gave thought or consideration to choosing a murder weapon or location but does support "an almost spontaneous eruption of events." *Taylor* at 19.

**{¶140}** Numerous witnesses testified that on the day of the incident: (1) they were at the property drinking and socializing; (2) Durham was at the property also; (3) at approximately 7:30 p.m., Durham was observed speaking with Coleman and did not appear to be arguing; (4) at some point, Durham and Coleman continued their conversation behind the property; (5) a gunshot or sound resembling a shot was heard; (6) Durham emerged from behind the property after the sound and Coleman did not; (7) everyone left the property; (8) Durham locked the gate and left concurrently; and (9) vehicles of the witnesses were observed in the O'Reilly videotape at 7:55 p.m.

{¶141}   Several of those witnesses stated that Durham always carried a gun at the shop or was often observed carrying a gun. Boseman stated Durham always had one of two guns with him at the shop — a revolver and a semi-automatic.

{¶142}   Pankey testified that Durham arrived at her home about 9:00 or 9:30 p.m. and was in and out of the bathroom, running water.  Durham had her wash his clothes at midnight or 1:00 a.m., something he had never requested, claiming they smelled like smoke.  Pankey noticed that Durham's coat was in the basement utility basin. Durham's habit upon entering Pankey's home was to hang his coat on the dining room chair and request that she prepare something for him to eat, ultimately followed by intimacy, but none of these activities occurred that evening.  Durham also told Pankey not to tell the police about washing his clothing and that if she told the police he arrived at 9:30 p.m., and not at 6:00 p.m. as he requested, he was "hit."

{¶143}   Forensic cell phone tower evidence and cell phone records confirmed Durham's presence in the direct area of the property with an easterly tower shift that is the direction of the Lee and Miles intersection. There is also the answered phone call from Coleman to Durham at 7:34 p.m. and, after 8:00 p.m. that evening, no calls were made or answered by Coleman.

{¶144}   The state argues that the conviction in this case meets the factors enumerated in *Taylor, supra*, and relevant case law: (1) Coleman and Durham knew each other and were in a business relationship where a rift had recently occurred; (2) Durham had a gun while he awaited Coleman's arrival and received a call from Coleman at 7:34 p.m.; and (3) Durham lured Coleman out of site, behind the property, so there would be no

eyewitnesses.

{¶145} We find the state's theory to be unsupported by the evidence, particularly the theory that Durham intentionally "lured" the defendant behind the property. Durham was known to regularly carry a gun, and "[t]he mere fact that defendant was carrying a gun * * * is not sufficient to demonstrate a prior calculation and design * * *." *State v. Davis*, 8 Ohio App.3d 205, 207, 456 N.E.2d 1256 (8th Dist.1982); *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 23. It is also defies logic to conclude that Durham's plan was to, after those present knew he and Coleman were talking, lure Coleman behind the property and shoot him, resulting in the parade of witnesses to the circumstances as has transpired in this case.

{¶146} The state also offers that prior calculation and design may be present even if the assailant quickly conceived the plan, *State v. Coley*, 93 Ohio St.3d 253, 264, 2001-Ohio-1340, 754 N.E.2d 1129 (victim driven to alley, shot between eyes and car stolen). *See also State v. Palmer*, 80 Ohio St.3d 543, 1997-Ohio-312, 687 N.E.2d 685.

{¶147} The appellant in *Palmer* was a passenger in his friend's ("Hill") vehicle when Hill rear-ended a white pick-up truck driven by Sponhaltz. The drivers exited and began arguing. Palmer exited the vehicle with gun loaded and cocked, and shot the truck driver twice in the head. A passing motorist ("Vargo") saw Palmer and Hill loading Sponhaltz's body into the pick-up, pulled behind Hill's car and asked what was going on. Palmer walked up to Vargo and shot him twice in the head also. *Id.* at 568.

{¶148} Hill and Palmer abandoned the pick-up containing the first victim in a field. The second driver was left at the scene. *Id.* The court found the element of prior

calculation had been met.

> "[T]he fact that appellant got out of Hill's vehicle with a loaded [single action] pistol that was cocked and ready to fire gives rise to the inference that appellant intended to use that weapon. That inference is also independently supported by the fact that appellant shot Sponhaltz twice in the head in an execution-style killing. * * * With respect to Vargo's murder, there was also evidence at trial which, if believed, reveals that appellant admitted killing Vargo because appellant had feared that Vargo may have witnessed the first shooting."

*Id.* at 569-570.

{¶149} A cold-blooded, execution style murder has also been found to meet the element of prior calculation and design. *State v. Campbell*, 90 Ohio St.3d 320, 330, 2000-Ohio-183, 738 N.E.2d 1178 (defendant ordered victim to get down on truck floor board and shot him at close range in the face and neck), citing *Palmer* at 570 (victim shot, fell to ground, followed by two shots to the head at close range); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 (three people were shot multiple times at close range). However, these legal constructs also fail to support the state's burden in this case where the only evidence is that a single gunshot occurred and the other elements of prior design are lacking.

{¶150} It is beyond peradventure that a criminal conviction "cannot rest upon mere speculation; the state must establish the guilt of the accused by proof beyond a reasonable doubt. *State v. Haynes*, 25 Ohio St.2d 264, 270, 267 N.E.2d 787 (1971)." *State v. Brown*, 8th Dist. Cuyahoga No. 98540, 2013-Ohio-1982, ¶ 31.

{¶151} Based on the foregoing, and viewed in a light most favorable to the prosecution, we find that the state has failed to prove the essential elements of aggravated

murder, specifically the element of prior calculation and design, beyond a reasonable doubt. *Leonard* and *Jenks, supra.* "[A] reversal on sufficiency grounds would bar retrial on the counts affected." *State v. Birinyi*, 8th Dist. Cuyahoga Nos. 95680 and 95681, 2011-Ohio-6257, ¶ 30, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Therefore, Durham's conviction for aggravated murder is reversed, with no opportunity for retrial.

{¶152} The state has, however, met its burden of proving murder and felonious assault. The elements for the murder conviction are present.

> "[A] person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense. In other words, the predicate offense contains the mens rea element for felony murder. *See State v. Sandoval*, 9th Dist. Lorain No. 07CA009276, 2008-Ohio-4402, ¶ 21."

*State v. Driggins,* 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 77.

{¶153} The underlying predicate offense in this case is felonious assault, R.C. 2903.11. The state demonstrated that Durham knowingly caused serious physical harm to another, and knowingly caused physical harm to another using a dangerous ordnance (a gun) constituting felonious assault in violation of R.C. 2903.11(A)(1) and (2). "'[S]erious physical harm' is defined as 'any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement.' R.C. 2901.01(A)(5)(d). 'Physical harm' means any injury, regardless of duration." R.C. 2901.01(A)(3). *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 18.

**{¶154}** We find that, as to the aggravated murder conviction, Durham's argument on the sufficiency of the evidence has merit. The aggravated murder conviction is hereby reversed.[3] The convictions for murder and felonious assault are affirmed.

### b. Weight

**{¶155}** Durham argues that the jury's determination that he is the one who shot Coleman is against the manifest weight because there is no evidence. After a thorough review of the evidence, sitting as a thirteenth juror, we find that Durham's argument lacks merit.

**{¶156}** We reiterate our observation under the sufficiency argument that numerous witnesses saw Durham and Coleman talking at the property, a shot was fired, only Durham emerged and everyone departed. Durham locked the gate when leaving. The vehicles of those who were passing through the Lee and Miles intersection, including Durham's Taurus, are depicted in the O'Reilly videotape.

**{¶157}** The cell phone and cell tower evidence substantiates the presence of the parties at the property the evening of April 14, 2014. Pankey's testimony about Durham's unusual behavior when he arrived at her residence, coupled with Durham's request that Pankey lie about the time that he arrived at her house and refrain from telling the police about washing his clothes adds another log to the evidentiary fire.

---

[3] Only a concurring majority of an appellate panel is needed to reverse a judgment based upon the sufficiency of the evidence, as opposed to the unanimous concurrence required for a reversal based upon the manifest weight of the evidence. *Thompkins* at 386.

{¶158} Durham regularly carried a revolver or semiautomatic weapon and a shell casing was located near the body. Officer Tate testified that Durham told someone that Coleman had been shot in the neck before the authorities received that information from the medical examiner. A number of witnesses testified that Durham also failed to react with surprise when notified of Coleman's death.

{¶159} None of those who were present walked to the back of the property to check on Coleman, testifying they did not want to get involved. Last, but not least, Durham locked the gate as they were all departing, indicating that he knew Coleman was not coming out either.

{¶160} As Durham asserts, there were no eyewitnesses to the shooting. The majority of the evidence was circumstantial. "Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." (Citations omitted.) *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).

{¶161} Based on the foregoing, it was reasonable for the jury to find the witnesses to be credible. As a result, we do not find that the jury clearly lost its way, creating a manifest miscarriage of justice as to the charges of murder and felonious assault. *Martin* at 175; *Leonard* at 68. Durham's convictions for murder and felonious assault are affirmed.

{¶162} Reversing the trial court's judgment on the manifest weight of the evidence requires the unanimous concurrence of all three appellate judges. Due to a lack of

unanimity on the aggravated murder conviction, we reject Durham's manifest weight argument on that conviction. *See State v. Crumbley*, 8th Dist. Cuyahoga No. 93202, 2010-Ohio-3866, ¶ 20, citing *Thompkins, supra*.

## B. Ineffective Assistance of Counsel

{¶163} We now address Durham's remaining assignment of error, that defense counsel's failure to file a motion to suppress the three-hour interview with homicide detectives conducted without a *Miranda*[4] warning, and the seizure and search of Durham's car constitutes ineffective assistance of counsel. We disagree.

### 1. Standard of Review

{¶164} In order to substantiate a claim of ineffective assistance of counsel, the appellant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 669, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judicial scrutiny of defense counsel's performance must be highly deferential. *Strickland*, 104 S.Ct. at 2065. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun*, 86 Ohio St.3d 279, 1999-Ohio-102, 714 N.E.2d 905.

### 2. Analysis

{¶165} The failure of trial counsel to file a motion to suppress "does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389,

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2000-Ohio-448, 721 N.E.2d 52, quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).*"* *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 126. A defendant must prove that there was a basis to suppress the evidence in order to establish ineffective assistance of counsel. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65, citing *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 35.

{¶166} An appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion where the record "contains no evidence which would justify the filing of a motion to suppress." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). "'Even if some evidence in the record supports a motion to suppress, counsel is still considered effective if counsel could reasonably have decided that filing a motion to suppress would have been a futile act.'" *State v. Moon*, 8th Dist. Cuyahoga No. 101972, 2015-Ohio-1550, ¶ 28, quoting *State v. Suarez*, 12th Dist. Warren No. CA2014-02-035, 2015-Ohio-64, ¶ 13; *State v. Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, ¶ 33 ("[t]he failure to do a futile act cannot be the basis for_claims of ineffective assistance of counsel and is not prejudicial.").

### a.    The Interview Videotape

{¶167} Durham argues that his statement was used against him to show that Durham may have been lying about speaking with Coleman shortly before his death. Statements made by a suspect may not be used in evidence where those statements were made during a custodial interrogation unless *Miranda* warnings were properly given to the

suspect. *State v. Andrews*, 3d Dist. Allen No. 1-05-70, 2006-Ohio-3764, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant argues that counsel was ineffective by failing to file a motion to suppress the statement because Durham was not *Mirandized*.

{¶168} A court must look at the totality of the circumstances in order to determine whether an individual is in custody at any given time. *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). *Id.* at 1125. *Miranda* warnings are required where an individual is subject to custodial interrogation, defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Miranda* at 444.

{¶169} Interrogation is defined as any "statement, question or remark by a police officer * * * reasonably likely to elicit an incriminating response * * *." *In re Forbess*, 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, citing *State v. Knuckles*, 65 Ohio St.3d 494, 1992-Ohio-64, 605 N.E.2d 54, paragraph two of the syllabus. "[A] person is considered in custody for purposes of *Miranda* when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." *Id.*, citing *State v. Simpson*, 10th Dist. Franklin No. 01AP-757, 2002-Ohio-3717. The appropriate inquiry for determining if an individual has been placed in custody is whether, under the totality of the circumstances, a reasonable person would believe he is not free to leave. *State v. Gumm,* 73 Ohio St.3d 413, 429, 1995-Ohio-24, 653 N.E.2d 253, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

**{¶170}** According to the record, Durham entered the police car voluntarily after Officer McMahon asked him whether he would be willing to meet with homicide detectives. Testimony demonstrates the temperature was about 32 degrees so the officer's explanation about Durham waiting inside the police car pending a meeting with the homicide detectives was reasonable under the circumstances. Durham was not cuffed or restrained and was freely speaking on his cell phone. Officer Tate was doing paperwork in the front seat and Durham did not ask to exit the vehicle.

**{¶171}** Durham was taken to the police station for the interview for videotaping. *Miranda* warnings are not required simply because questioning takes place in a courthouse or police station. *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Upon a review of the videotape, Durham was quite conversational and voluntarily talked at length. Durham did not ask to terminate the interview, and he was in no way restrained. There was no confession to the crime. At the conclusion of the interview, he was returned to the Fourth District police station where Pankey picked him up. Thus, we do not find that, under a totality of the circumstances, a reasonable person would believe he was not free to leave. *Mendenhall* at 554.

**{¶172}** We take note of the testimony by Detective Lynch that Durham was a person of interest and was taken to the station for a videotaped interview because of state law. However, we determine that, were we to conclude that a *Miranda* violation did occur, harmless error applies:

> An error in the admission of evidence is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction. *State v. Lytle*, 48 Ohio St. 2d 391, 358 N.E.2d 623 (1976), at

paragraph three of the syllabus. "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams* (1983), 6 Ohio St. 3d 281, 452 N.E.2d 1323, paragraph six of the syllabus.

*State v. Jeffries*, 8th Dist. Cuyahoga No. 76905, 2000 Ohio App. LEXIS 3834, *9-10, 2000 WL 1222012 (Aug. 24, 2000).

{¶173} There is overwhelming evidence in the record of Durham's presence at the property with Coleman as we have detailed in the sufficiency and manifest weight discussion herein. The cell tower evidence, supplemented by witness testimony, demonstrated Durham's stationary presence at the property until approximately 8:00 p.m. The O'Reilly videotape showed Durham's vehicle at the Lee and Miles intersection at approximately 7:55 p.m., concurrently with the vehicles of the witnesses that testified he was at the property. Cell phone records for the phones of Coleman and Durham show that Coleman talked with Durham briefly at 7:34 p.m. The record supports that any error for purposes of *Miranda* was harmless, and that Durham suffered no prejudice thereby.

### b. The Vehicle

{¶174} The second component of the ineffective assistance argument is trial counsel's failure to file a motion to suppress the evidence obtained from the Ford Taurus. The Fourth and Fourteenth Amendments to the United States Constitution, and Section 14, Article I, Ohio Constitution, prohibit governmental search and seizure without probable cause and a warrant, except for exceptional circumstances. Durham argues that the officers had no probable cause or specific articulable facts upon which to base the seizure of the vehicle.

**{¶175}** Detective Lynch testified that officers observed Durham drive up to the property in the Ford Taurus. Based on information provided by witnesses at the scene, they were aware that Durham was alleged to be the person who had last seen Coleman alive and that Durham was driving the Ford Taurus at the time, placing the vehicle at the crime scene.

**{¶176}** The authorities decided to "process-tow" the vehicles of Durham and Coleman. Detective Lynch explained the process-tow policy and procedure employed by the CPD and the documentation of the tow on the processing form, state's exhibit No. 292. The vehicle is towed to a specific impound lot where it is placed inside of a building and is not touched or entered by anyone. There is an exterior hook-up to the tow truck so that no driver or officer enters the vehicle, and a zone car follows the tow truck to the impound building.

**{¶177}** The vehicle remains enclosed in the property until it is searched. The purpose of the process tow is preservation of evidence. The first page of the tow sheet includes a list of the types of evidence to be tested for. Additional pages document the testing and who conducts the processing. Durham's vehicle was not searched until a warrant was obtained on April 18, 2014.

**{¶178}** This court addressed the legality of a vehicle seizure to protect evidence pending the issuance of a search warrant in *State v. Collins*, 8th Dist. Cuyahoga No. 95415, 2011-Ohio-3241. In *Collins*, four siblings under the age of 13 died of asphyxiation in an gasoline-fueled arson fire. *Id.* at ¶ 4. Collins's co-defendant ultimately confessed to police that he accompanied Collins the night

of the fire and witnessed Collins enter the property with gasoline and run out. He also saw Collins set a car on fire. *Id*. at ¶ 12.

{¶179} Collins was seen driving a blue Saab on the night of the fire. When Collins's sister went to the police station in a blue Saab, the police ran the license plate and discovered that a third party owned the vehicle, not Collins. Subsequent to Collins's arrest, the police located and impounded the vehicle and, after obtaining a warrant, tested it for traces of gasoline. The car's back seat mats tested positive for gasoline. *Id.* at ¶ 16. The police obtained a warrant and tested the interior for gasoline.

{¶180} Collins filed a motion to suppress the "seizure" of the vehicle. *Id.* This court held:

> [T]he search was not unlawful because the officers did not search the vehicle until after they had obtained a search warrant. Thus, the only basis for challenging the search of the vehicle was the seizure of the vehicle prior to the search. While Collins contended at the suppression hearing that the car was parked in his driveway when it was towed, in his suppression motion he stated the car was parked on the public street. Regardless of where the car was located when it was towed, the officers had probable cause to seize the vehicle. Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). If there is probable cause to search a motor vehicle, it is reasonable under the Fourth Amendment for police to either seize the vehicle and hold it before presenting the probable cause issue to a magistrate or to carry out an immediate warrantless search. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Prior to seizing the car, the officers had arrested Collins for setting the fire. They had also been told by several people that Collins was driving the blue Saab around the time of the fire. This knowledge was sufficient to warrant a belief that the vehicle contained evidence of Collins's involvement in the crime.
>
> Moreover, obtaining a warrant prior to seizing the vehicle would create delay. Given the fact the car could easily be moved and any evidence contained within destroyed, it was prudent for the officers to seize the

vehicle. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The officers minimized the intrusion by waiting to search the car until after a search warrant was obtained.

*State v. Collins*, 8th Dist. Cuyahoga No. 95415, 2011-Ohio-3241, ¶ 18-19.

{¶181} Witnesses told authorities at the crime scene that Durham was the last person seen with Coleman at the property and that Durham drove a Ford Taurus. Durham returned to the crime scene in the Ford Taurus. "Given the fact that the car could easily be moved and any evidence contained within destroyed, it was prudent for the officers to seize the vehicle." *Id*. at ¶19.

{¶182} Durham has failed to demonstrate that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, *Strickland v. Washington*, both *supra*. Appellant's third assignment of error is overruled.

## V. CONCLUSION

{¶183} Based on our findings regarding the sufficiency of the evidence, the conviction and sentence for aggravated murder is reversed; and the case is remanded for sentencing on the remaining counts of murder and felonious assault, with specifications. The conviction for having a weapon while under disability has not been contested.

It is ordered that appellant and appellee equally split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to

Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
KATHLEEN ANN KEOUGH, P.J., DISSENTS
WITH SEPARATE OPINION

KATHLEEN ANN KEOUGH, P.J., DISSENTING:

{¶184} Respectfully, I dissent. I find there was sufficient evidence of prior calculation and design to support the jury's verdict that Durham was guilty of aggravated murder in violation of R.C. 2903.01(A).

{¶185} The evidence established that Coleman and Durham had known each other for years but their relationship had become strained in the days and weeks before the homicide. The evidence also established that Coleman went to the Miles Avenue property on April 14, 2014, to meet with Durham and tell him to leave the property, and that he called Durham before he arrived, presumably to tell him that he was coming. Durham, who had a gun on his person, waited for Coleman's arrival, and then shot him shortly after he arrived. Although regularly carrying a gun is not by itself sufficient to demonstrate prior calculation and design, in this case, Durham had sufficient time after Coleman's telephone call to formulate a plan to kill him.

{¶186} Moreover, even if he formulated the plan only after he and Coleman went behind the building, prior calculation and design can be found even when the killer quickly

conceived and executed the plan. Viewing the evidence of Coleman and Durham's strained relationship, Coleman's telephone call to Durham shortly before he was murdered, Durham's use of the gun that was already in his pocket, and the location of the homicide — behind the building where no one could see what happened — in a light most favorable to the prosecution, I find sufficient evidence of prior calculation and design to support the jury's verdict that Durham was guilty of aggravated murder.